USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 93-1842 WALTON W. McCARTHY, Plaintiff, Appellee, v. LEO L. AZURE, JR., Defendant, Appellant. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Shane Devine, Senior U.S. District Judge] __________________________ _________________________ Before Selya, Cyr and Boudin, Circuit Judges. ______________ _________________________ David R. Goodnight, with whom Patrick D. McVey, Howard A. ___________________ ________________ _________ Coleman, Riddell, Williams, Bullitt & Walkinshaw, D. Donald _______ ___________________________________________ __________ Dufresne, and Devine, Millimet & Branch were on brief, for ________ ___________________________ appellant. Charles A. Szypszak, with whom Richard B. Couser and Orr and ___________________ _________________ _______ Reno, P.A. were on brief, for appellee. __________ _________________________ April 28, 1994 _________________________ SELYA, Circuit Judge. This appeal presents intriguing SELYA, Circuit Judge. _____________ questions anent the rights of a corporate officer who, having signed an agreement containing an arbitration clause in his official capacity, seeks to compel arbitration of claims lodged against him as an individual. The district court refused to order arbitration under these circumstances. We affirm. I. BACKGROUND I. BACKGROUND For purposes of this appeal, the facts can be taken essentially as alleged. In 1987, plaintiff-appellee Walton W. McCarthy, a renowned inventor of underground shelter technology, incorporated T.H.E.T.A. Technologies, Inc. (Theta I), a New Hampshire corporation, for the purpose of manufacturing underground storage tanks and personal shelters. McCarthy owned fifty percent of the corporation's stock and served as its principal operating officer. Three passive investors held the remaining shares. In the fall of 1989, McCarthy met defendant-appellant Leo L. Azure, Jr., a member of a Montana-based religious organization, Church Universal & Triumphant (C.U.T.). Azure soon entered into negotiations for the acquisition of both McCarthy's company and patented technology. Azure formed a Washington corporation, Theta Corporation (Theta II), to serve as a vehicle for the planned purchase. On December 29, 1989, McCarthy, Theta II, and others 2 entered into a contract (the Purchase Agreement).1 Azure signed the Purchase Agreement on behalf of Theta II, but he did not sign it in his personal capacity. Leaving to one side special arrangements with various creditors, see supra note 1, this ___ _____ contract delineated a two-phase transaction: McCarthy was to sell his equity interest, including the patents, to the passive investors, and transfer certain residual rights to Theta II; then, Theta II was to buy all the outstanding stock of Theta I for cash, payable over a period of no more than three years. The Purchase Agreement expressly provided that "[d]isputes arising under this Agreement shall be resolved by arbitration. . . ." Though not mentioned in the Purchase Agreement, the parties apparently understood that Theta II, in addition to paying McCarthy a prescribed sum of money for the transferred rights, would offer him employment under a separate long-term contract. On January 11, 1990, McCarthy and Theta II executed a second agreement (the Confidentiality Agreement). Azure signed the Confidentiality Agreement, as he had signed the Purchase Agreement, on behalf of Theta II, but not otherwise; indeed, neither document contained a line for Azure's personal signature. Pursuant to the Confidentiality Agreement, McCarthy promised to keep all past and future information pertaining to the patents in the bosom of the lodge, and to take certain related actions on ____________________ 1Apart from McCarthy and Theta II, other parties to the Purchase Agreement included the passive investors and three major creditors of Theta I. For present purposes, nothing turns on the involvement of the other parties. 3 behalf of Theta II. This agreement included a somewhat more expansive arbitration clause, which stated that "[a]ny controversy or claim arising out of or relating to this Agreement, or breach hereof, shall be settled by arbitration. . . ." At a closing held the next day, Theta II delivered a letter (the Employment Letter) engaging McCarthy as its president, chief engineer, and chief executive officer at a stipulated annual salary. The Employment Letter also provided for stock options. It did not include an arbitration clause. A little over two weeks after the closing, matters took a turn for the bizarre (or, at least, for the mystical). On January 28, 1990, Elizabeth Clare Prophet, Azure's spiritual leader, informed him, on the advice of a "dead ascended master" of C.U.T., that his newly acquired business was incompatible with his "divine plan" and that he should not devote further energy to the enterprise. Azure dutifully directed McCarthy to cashier all the employees of Theta II, and then proceeded to terminate McCarthy's employment. McCarthy never obtained any ownership interest in Theta II, notwithstanding the promises contained in the Employment Letter. Apparently, Azure's religious convictions took him so far, and no further. He not only continued operating the Theta corporations, but also formed a third company, Omega Corporation. In October of 1990, after Azure merged Theta I into Theta II, Omega acquired the surviving entity. The following July, it began selling shares to the public. For all intents and 4 purposes, Omega's business seemed indistinguishable from that of Theta I and Theta II; Omega styled itself as a leader in underground storage and marketed tanks manufactured pursuant to McCarthy's patented technology. Unwilling to turn the other cheek, McCarthy sued Azure, Theta II, Omega, C.U.T., and Prophet in the United States District Court for the District of New Hampshire.2 Azure, Theta II, and Omega filed a motion to stay proceedings pending arbitration, contending that the serial agreements obligated plaintiff to arbitrate all claims. The district court granted the motion with respect to Theta II, but denied it as to the remaining movants. Azure appeals the district court's order refusing to stay the action against him. We have jurisdiction by virtue of 9 U.S.C. 16(a)(1) (Supp. 1992). II. DISCUSSION II. DISCUSSION The court below reasoned that the source of appellant's purported right to compel arbitration must be found, if at all, in the Purchase Agreement.3 It then denied appellant's motion ____________________ 2The complaint asserted claims against Azure, Theta II, and Omega for, inter alia, breach of contract, wrongful discharge, _____ ____ fraud, negligent misrepresentation, intentional infliction of emotional distress, unfair trade practices, federal and state securities violations, and racketeering. It also asserted claims against Azure, C.U.T., and Prophet for tortious interference with contractual relationships. Jurisdiction was premised on the existence of both federal questions, 28 U.S.C. 1331 (1988), and diversity of citizenship, 28 U.S.C. 1332(a)(1) (1988). 3Because the Confidentiality Agreement granted legal rights only to Theta II and not to McCarthy, we agree with the district court's conclusion that it could not furnish a basis for precluding access to a judicial forum in respect to claims asserted by McCarthy against Azure. For that reason, and for the 5 to stay on the ground that he was not a party to the Purchase Agreement and, therefore, could not compel arbitration of claims lodged against him personally, whether or not those claims related to that agreement. Azure's appeal tests this thesis. Because the appeal presents a question of law, appellate review is plenary. See United States v. Gifford, ___ F.3d ___, ___ (1st ___ _____________ _______ Cir. 1994) [No. 93-1645, slip op. at 20]; Liberty Mut. Ins. Co. ______________________ v. Commercial Union Ins. Co., 978 F.2d 750, 757 (1st Cir. 1992). _________________________ A. General Principles. A. General Principles. __________________ We start with bedrock: "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T ____ Technologies, Inc. v. Communications Workers, 475 U.S. 643, 648 __________________ ______________________ (1986), quoting United Steelworkers v. Warrior & Gulf Navig. Co., _______ ___________________ _________________________ 363 U.S. 574, 582 (1960). Thus, a party seeking to substitute an arbitral forum for a judicial forum must show, at a bare minimum, that the protagonists have agreed to arbitrate some claims. ____ This imperative is in no way inconsistent with the acknowledged "federal policy favoring arbitration." Moses H. ________ Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 ____________________ ______________________ (1983); see also Shearson/American Express, Inc. v. McMahon, 482 ___ ____ ________________________________ _______ U.S. 220, 226 (1987). The federal policy presumes proof of a preexisting agreement to arbitrate disputes arising between the protagonists. Once that agreement has been proven and the ____________________ added reason that appellant, individually, was not a signatory to the Confidentiality Agreement, our analysis revolves around the Purchase Agreement. 6 protagonists identified, cases such as Cone and McMahon instruct ____ _______ courts to use a particular hermeneutical principle for interpreting the breadth of the agreement; that is, if the contract language chosen by the parties is unclear as to the nature of the claims to which an agreement to arbitrate extends, a "healthy regard" for the federal policy favoring arbitration requires that "any doubts concerning the scope of an arbitrable issue be resolved in favor of arbitration." Moses H. Cone, 460 ______________ U.S. at 24-25. The federal policy, however, does not extend to situations in which the identity of the parties who have agreed to arbitrate is unclear. See Painewebber, Inc. v. Hartmann, 921 ___ _________________ ________ F.2d 507, 511 (3d Cir. 1990) (holding that "[a]s a matter of contract, no party can be forced to arbitrate unless that party has entered into an agreement to do so"). Thus, requiring that arbitration rest on a consensual foundation is wholly consistent with federal policy. The requirement also makes perfect sense. Subject matter jurisdiction over an action or series of claims can be conceptualized as conferring a personal right on the parties to have that action, or those claims, adjudicated in a judicial forum. See, e.g., Pacemaker Diag. Clinic of America, Inc. v. ___ ____ _________________________________________ Instromedix, Inc., 725 F.2d 537, 541 (9th Cir. 1984) (en banc) __________________ (recognizing that the "federal litigant has a personal right, subject to exceptions in certain classes of cases, to demand Article III adjudication of a civil suit"); accord Glidden Co. v. ______ ___________ Zdanok, 370 U.S. 530, 536 (1962). Though a person may, by ______ 7 contract, waive his or her right to adjudication, see 9 U.S.C. ___ 2, there can be no waiver in the absence of an agreement signifying an assent. B. Framing the Issue. B. Framing the Issue. _________________ Viewed against this backdrop, the question before us reduces to a matter of contract interpretation: Did plaintiff, in executing the Purchase Agreement, agree to arbitrate disputes he might have with Azure personally concerning Theta-related ____ _____ __________ transactions?4 This question, which involves the interpretation of an arbitration provision touching upon matters of interstate commerce, must be resolved according to federal law. See ___ McGregor v. Industrial Excess Landfill, Inc., 856 F.2d 39, 46 n.2 ________ ________________________________ (6th Cir. 1988); Letizia v. Prudential Bache Securities, Inc., _______ __________________________________ 802 F.2d 1185, 1187 (9th Cir. 1986); see also 9 U.S.C. 2. As ___ ____ under general principles of contract law, the final answer to such a question is ordinarily a function of the parties' intent as expressed in the language of the contract documents. See NRM ___ ___ Corp. v. Hercules, Inc., 758 F.2d 676, 681 (D.C. Cir. 1985) _____ ______________ (explaining that contract interpretation, under federal law, "dovetails precisely with general principles of contract law," ____________________ 4Although plaintiff originally sued Azure in two capacities (individual and official), plaintiff agreed, following oral argument in this court, to abandon his "official capacity" claims against Azure. Given this agreement, plaintiff henceforth will be disabled from pursuing any such claims. See United States v. ___ _____________ Levasseur, 846 F.2d 786, 792-93 (1st Cir.) (explicating doctrine _________ of judicial estoppel), cert. denied, 488 U.S. 89 (1988); Patriot _____ ______ _______ Cinemas Inc. v. General Cinema, Corp., 834 F.2d 208, 211-15 (1st _____________ _____________________ Cir. 1987) (similar). Consequently, we deal in this opinion only with plaintiff's "individual capacity" claims against Azure. 8 such that, under both, "the judicial task in construing a contract is to give effect to the mutual intentions of the parties"); see also Local 1199 v. Brooks Drug Co., 956 F.2d 22, ___ ____ __________ _______________ 25 (2d Cir. 1992) (determining the parties' intent is the essential inquiry); S.A. Mineracao da Trinidade-Samitri v. Utah ____________________________________ ____ Int'l, Inc., 745 F.2d 190, 193 (2d Cir. 1984) (similar). ___________ This does not mean that state law is an irrelevancy. In general, federal courts developing federal common law are free to borrow from state law, unless there is either a demonstrated need for a uniform national rule or a significant conflict between state law and some discernible federal policy.5 See ___ United States v. Kimbell Foods, Inc., 440 U.S. 715, 728-30 _____________ _____________________ (1979). ____________________ 5When state law is likely to prove an appropriate model, but different states have an interest in the claim, it is reasonable for a federal court to apply the choice-of-law principles of the forum in order to ascertain what state's substantive law should be consulted. Cf., e.g., Klaxon Co. v. Stentor Elec. Mfg. Co., ___ ____ __________ _______________________ 313 U.S. 487, 496-97 (1941); Crellin Technologies, Inc. v. ____________________________ Equipmentlease Corp., ___ F.3d ___, ___ (1st Cir. 1994) [No. 93- _____________________ 1615, slip op. at 7-8]. Here, our task is simplified: the Purchase Agreement contains a provision directing the reader to New Hampshire law. Because a reasonable choice-of-law provision in a contract generally should be respected, see Restatement ___ (Second) of the Conflict of Laws 187 (1971); see also ___ ____ Ferrofluidics Corp. v. Advanced Vacuum Components, Inc., 968 F.2d ___________________ ________________________________ 1463, 1467 (1st Cir. 1992) (applying New Hampshire choice-of-law principles); Allied Adjustment Serv. v. Heney, 484 A.2d 1189, ________________________ _____ 1190-91 (N.H. 1948) (stating that the parties' selection of the law of a particular jurisdiction will be honored so long as "the contract bears any significant relationship to that jurisdiction"), we will from time to time consult New Hampshire law for guidance. Where New Hampshire law is recondite, we will turn to the types of materials that we believe the New Hampshire Supreme Court would look to in formulating new law. See Moores ___ ______ v. Greenberg, 834 F.2d 1105, 1107 (1st Cir. 1987) (describing _________ materials); see also Kathios v. General Motors Corp., 862 F.2d ___ ____ _______ _____________________ 944, 949 (1st Cir. 1988). 9 In this case, there is no overt indication that the parties intended to commit claims against appellant, as an __ __ individual, to an arbitral forum. After all, appellant signed __________ the Purchase Agreement solely in his capacity as an agent for a disclosed principal that is, as "Chairman" of Theta II and not in his personal capacity; and it is settled beyond peradventure that a person signing a contract only in a corporate capacity, and unambiguously indicating that fact on the face of the contract documents, does not thereby become a party to the agreement. See, e.g., New York Ass'n for Retarded Children, Inc. ___ ____ __________________________________________ v. Keator, 606 N.Y.S.2d 784, 785 (App. Div. 1993) (finding ______ corporation, but not individual, bound when president of corporation signed contract only on a line indicating his official capacity); Central Ill. Pub. Serv. Corp. v. Molinarolo, ______________________________ __________ 585 N.E.2d 199, 203 (Ill. App. Ct. 1992) (holding company, but not individual, liable "[w]hen an agent signs a document and indicates next to his signature his corporation affiliation"); Salzman Sign Co. v. Back, 176 N.E.2d 74, 76 (N.Y. 1961) (finding _________________ ____ no individual liability where defendant signed only as president of corporation and did not otherwise explicitly indicate in the contract an intent to be bound personally); cf. Dulik v. Amante, ___ _____ ______ 570 N.Y.S.2d 590, 591 (App. Div. 1991) (finding that a party, by signing the agreement twice, intended to bind both his corporation and himself). To be sure, the law recognizes certain contract and agency principles under which nonsignatories sometimes can be 10 obligated by, or benefit from, agreements signed by others, and these principles can apply to arbitration provisions. See, e.g., ___ ____ In re Oil Spill by Amoco Cadiz, 659 F.2d 789, 795-96 (7th Cir. ________________________________ 1981); Fisser v. International Bank, 282 F.2d 231, 233-34 (2d ______ ___________________ Cir. 1960) (collecting cases). Thus, appellant's failure to sign the Purchase Agreement individually does not in and of itself settle the somewhat different question of whether he can invoke the arbitration clause contained therein. Seizing on this possibility, appellant charts three routes by which he, as a nonsignatory, might achieve the sanctuary he desires. In the succeeding sections, we trace these routes and explain why we find them to be blind alleys. C. Appellant's Agency Theory. C. Appellant's Agency Theory. _________________________ Appellant's most heralded claim is that, as a disclosed agent of Theta II, he is entitled to enforce the arbitration provision included in his principal's agreement with the plaintiff. He buttresses this claim by citation to authority from several other courts of appeals. See Pritzker v. Merrill ___ ________ _______ Lynch, Pierce, Fenner & Smith, 7 F.3d 1110, 1121 (3d Cir. 1993); _____________________________ Roby v. Corporation of Lloyd's, 996 F.2d 1353, 1360 (2d Cir.), ____ ______________________ cert. denied, 114 S. Ct. 385 (1993); Arnold v. Arnold Corp., 920 _____ ______ ______ ____________ F.2d 1269, 1282 (6th Cir. 1990); Letizia, 802 F.2d at 1188. We _______ think appellant's reading of these cases is overly sanguine and that his claim is insupportable for several reasons. 1. Comparing Apples to Oranges. To put appellant's 1. Comparing Apples to Oranges. _____________________________ theorem into focus, we first must clarify the animating 11 principles that drive the cases on which the theorem rests. Doing so persuades us that appellant is comparing apples to oranges. To be sure, there is a superficial similarity between the precedents on which appellant relies and the situation at hand. In each of the four cited cases, the court gave a nonsignatory the benefit of an arbitration clause signed by the corporate entity for which he or she worked. In three of these cases, however, the defendant was sued qua employee and the court ___ specifically found that, as a matter of contract interpretation, the parties intended the arbitration provision to cover employees. See Roby, 996 F.2d at 1360 (observing that "the ___ ____ parties fully intended to protect the individual Chairs to the extent they are charged with misconduct within the scope of the agreements"); Arnold, 920 F.2d at 1282 (explaining that "the ______ language of the arbitration agreement indicates that the parties' basic intent was to provide a single arbitral forum to all disputes arising under the stock purchase agreement"); Letizia, _______ 802 F.2d at 1188 (determining that the company "clearly indicated its intention to protect its employees" by means of the arbitration provision). The fourth case also rested largely on contract language. See Pritzker, 7 F.3d at 1114 (noting the ___ ________ breadth of language used in formulating the arbitration clause). Here, however, as opposed to the cases marshalled by appellant, the arbitration clause fails to indicate the corporate signatory's intention to protect employees through arbitration, 12 see Letizia, 802 F.2d at 1188, and the very nature of the ___ _______ Purchase Agreement, as contrasted to the agreements underlying the other cases, explains why, in this situation, one would naturally expect such protection to be absent. For the most part, the cases hawked by appellant involve disputes growing out of service contracts between individuals and financial institutions.6 See Pritzker, 7 F.3d ___ ________ at 1114 (involving handling of cash management account); Roby, ____ 996 F.2d at 1357 (involving insurance underwriting); Letizia, 802 _______ F.2d at 1186 (involving handling of securities account). The claims diverted to arbitration in those cases and in other cases that appellant could have, but did not, rely upon, see, ___ e.g., Lee v. Chica, 983 F.2d 883, 887 (8th Cir. 1993); Scher v. ____ ___ _____ _____ Bear Stearns & Co., 723 F. Supp. 211, 216 (S.D.N.Y. 1989) were, __________________ without exception, in the nature of professional malpractice. Thus, each related directly to the essence of the service contract that the consumer-plaintiff had signed.7 The Purchase Agreement is at a considerable remove; it is primarily concerned ____________________ 6The solitary exception is Arnold. Yet, as we point out ______ subsequently, see infra note 10, that case is distinguishable on ___ _____ other grounds and, in all events, does not possess great persuasive force. 7This is not to suggest that similarity of claims alone suffices to clear the decks for arbitration. As we have made pellucid, see supra p. 7, the basic prerequisite is the parties' ___ _____ agreement to arbitrate, or, put another way, the existence of an actual waiver of the right to litigate. But similarity of claims sometimes may help to clarify what the parties intended when they included an arbitration provision in an instrument. 13 with a transfer of assets.8 The distinction is an important one. A person who enters into a service contract with a firm contemplates an ongoing relationship in which the firm's promises only can be fulfilled by future (unspecified) acts of its employees or agents stretching well into an uncertain future. A person who contracts to transfer assets to a company faces a much different prospect: a one-shot transaction in which the purchaser's obligations are specified and are, essentially, performed in full at the closing, or soon thereafter. So it is here. And because the Purchase Agreement cannot easily be construed to refer to the operations of, or services rendered by, Theta II, that company's employees cannot plausibly be included by implication within the ambit of either the agreement or its arbitration clause.9 2. The Scope of the Arbitration Clause. Close textual 2. The Scope of the Arbitration Clause. ___________________________________ analysis supports the conclusion that the Purchase Agreement's arbitration clause should be read more narrowly than the clauses in the cases upon which appellant relies. The Purchase Agreement provides that disputes "arising under" the agreement will be subject to arbitration. This language is considerably more ____________________ 8While one section of the Purchase Agreement describes the sellers' retention of a right to purchase products from Theta II at preferential prices and to distribute those products in New England, appellant has not argued that any of McCarthy's claims implicate this distribution provision. 9Although we do not decide the point, we note that even an implied reference likely would not suffice as a predicate for enforced arbitration. See Salzman Sign, 176 N.E.2d at 76 ___ _____________ (requiring "direct and explicit evidence of actual intent" as a prerequisite to finding an obligation to arbitrate). 14 confining than that employed in other contracts to which appellant alludes.10 See Pritzker, 7 F.3d at 1114 (agreeing to ___ ________ arbitrate "all controversies which may arise between us, including but not limited to . . . this or any other agreement between us, whether entered into prior, or subsequent to the date hereof"); Roby, 996 F.2d at 1361 (agreeing to arbitrate any ____ "dispute, difference, question or claim relating to" the ____________ agreements for "all purposes of and in connection with" them) ___________________ (emphasis in original); Letizia, 802 F.2d at 1186 (agreeing to _______ arbitrate disputes "arising out of or relating to" plaintiff's securities account). The circumscribed nature of the Purchase Agreement's arbitration provision stands out in bold relief when one compares it with the arbitration provision in the Confidentiality Agreement. Whereas the former directs arbitration only of "[d]isputes arising under [the agreement]" (emphasis supplied), _____ the latter directs arbitration of "[a]ny controversy or claim _____ arising out of or relating to [the agreement]" (emphasis ___________________________________ supplied). Although the Purchase Agreement's arbitration clause might arguably be read more broadly if it were the only provision ____________________ 10Once again, the sole exception is Arnold, a case in which ______ the arbitration clause is virtually identical to the provision contained in the Purchase Agreement. See Arnold, 920 F.2d at ___ ______ 1271. But in Arnold, unlike in this case, the stated clause ______ comprised the only arbitration provision at issue, thus making it much easier to read the language broadly. See infra pp. 15-16 ___ _____ (discussing interpretive significance of dual agreements) and cases cited. At any rate, to the extent that Arnold can be read ______ to support a result at odds with the result that we reach today, we respectfully decline to follow it. 15 extant, see, e.g., Arnold, 920 F.2d at 1271; Martin Marietta ___ ____ ______ ________________ Alum., Inc. v. General Elec. Co., 586 F.2d 143, 145, 147-48 (9th ___________ __________________ Cir. 1978), the use of significantly different language in two clauses, sculpted by the same parties during the same negotiations as part of the same overall transaction, strongly suggests that the signatories intended the arbitration provisions to be of different scope. See Appalachian Ins. Co. v. McDonnell ___ ____________________ _________ Douglas Corp., 262 Cal. Rptr. 716, 725 (Ct. App. 1989) (holding _____________ that "[t]o ignore the differences in language used in the two agreements would violate a fundamental rule of contract interpretation, that is, the words of a contract, if clear, must govern its interpretation"); see also Triple-A Baseball Club ___ ____ ________________________ Assoc. v. Northeastern Baseball, Inc., 832 F.2d 214, 221-22 (1st ______ ____________________________ Cir. 1987) (adopting narrow construction where a contract did not include relatively broad language found in the parties' earlier drafts), cert. denied, 485 U.S. 935 (1988); C & M Realty Trust v. _____ ______ __________________ Wiedenkeller, 578 A.2d 354, 357 (N.H. 1990) (declaring that a ____________ court's role is to interpret contracts in accordance with the parties' intent discernible at the time of agreement, as measured by objective criteria). The intent to limit arbitral rights to signatories is also made manifest by the inclusion of an integration clause in the Purchase Agreement. The integration clause states that the written agreement "represents the entire understanding of the parties" and "supersedes all other understandings, arrangements and negotiations." We, and other courts, routinely have declined 16 to read unwritten terms into agreements containing similar declarations. See, e.g., Bidlack v. Wheelabrator Corp., 993 F.2d ___ ____ _______ __________________ 603, 608 (7th Cir.) (explaining that an integration clause is an "indication of the parties' desire to limit a free-ranging judicial discretion to interpolate terms"), cert. denied, 114 S. _____ ______ Ct. 291 (1993); Northern Heel Corp. v. Compo Indus., Inc., 851 ____________________ ___________________ F.2d 456, 466 (1st Cir. 1988) (similar). Applying that time- honored principle here, it would be wrong to widen the arbitration clause to include the signatories' agents and employees. In short, the Purchase Agreement itself is the best indicator of the parties' intent. We must honor that intent an intent which, for our purposes, translates into a direction to read the arbitration clause set forth in the Purchase Agreement straightforwardly rather than expansively. Operating in this mode, it is difficult to see how a lawsuit between the seller and a nonsignatory who is not a successor in interest to the buyer's rights can be said to "aris[e] under" the Purchase Agreement.11 Thus, appellant's effort to compel plaintiff to arbitrate cannot succeed, for, "as a matter of contract, no party can be forced to arbitrate unless that party has entered an agreement to do so." Painewebber, 921 F.2d at 511. ___________ 3. The Individual Capacity/Official Capacity Schism. 3. The Individual Capacity/Official Capacity Schism. _________________________________________________ ____________________ 11By its terms, the Purchase Agreement "shall be binding upon and inure to the benefit of the [parties'] successors and assigns. . . ." There is no comparable provision anent the parties' agents, servants, or employees. We think the omission is telling. 17 For present purposes, we regard the distinction between Azure, in his personal capacity, and Azure, in his representative capacity, as possessing decretory significance.12 Not coincidentally, in each of the four cases relied on by appellant the court confronted a situation in which the claim asserted related to actions undertaken by a corporate representative in his or her official, rather than personal, capacity; and each of the courts based its holding on this circumstance. See Roby, 996 F.2d at ___ ____ 1360 (concluding that the "complaints against the individual Chairs are completely dependent on the complaints against the [principals] . . . [and] arise[] out of the same misconduct charged against the [principals]"); Arnold, 920 F.2d at 1282 ______ (similar); see also Pritzker, 7 F.3d at 1114 (reciting facts ___ ____ ________ demonstrating that the nonsignatory was being sued for acts within the scope of her role as an agent of the signatory corporation); Letizia, 802 F.2d at 1188 (finding that all the _______ individual defendants' allegedly wrongful acts related to their employment responsibilities). Here, in contradistinction, plaintiff asserts claims against Azure in his personal, rather than his corporate, capacity. See supra note 4. This is no mere semantic quibble. ___ _____ An official capacity suit is, in essence, "another way of pleading an action against an entity of which an officer is an ____________________ 12We use the terms "individual capacity" and "personal capacity" interchangeably, and we use the terms "official capacity," "representative capacity," and "corporate capacity" in the same manner. 18 agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citations ________ ______ omitted). Consequently, such a suit "is, in all respects other than name, to be treated as a suit against the entity." Id. at __ 166. By contrast, personal capacity suits proceed against the individual, not against the entity with which the individual is affiliated. In the corporate context, personal capacity actions can take several forms, including by way of illustration claims alleging ultra vires conduct, see, e.g., Expomotion, Ltd. v. _____ _____ ___ ____ ________________ Heidepriem-Santandrea Inc., 421 N.Y.S.2d 520, 521 (Civ. Ct. ___________________________ 1979); tort suits in which a corporate officer or agent, though operating within the scope of corporate authorization, "through his or her own fault injures another to whom he or she owes a personal duty," 3A William M. Fletcher, Fletcher Cyclopedia of _______________________ the Law of Private Corporations 1135, at 66-67 (1986 ed. & _________________________________ Supp. 1992);13 and, of more immediate applicability, suits alleging that a person affiliated with a corporation created or manipulated it as part of a larger (fraudulent) scheme, see, ___ e.g., Dietel v. Day, 492 P.2d 455, 457-58 (Ariz. Ct. App. 1972) ____ ______ ___ (explaining that "[i]f a corporation was formed or is employed for fraudulent purposes," personal liability may be imposed). It is, therefore, apparent that drawing a distinction between individual capacity and representative capacity claims is ____________________ 13In this type of situation, the "officer or agent is personally liable to the injured third party regardless of whether the act resulting in injury is committed by or for the corporation." 3A Fletcher, supra, 1135, at 67. _____ 19 to draw a distinction that portends a meaningful legal difference. Indeed, the distinction between claims aimed at a defendant in his individual as opposed to representative capacity can be found across the law. See, e.g., Stafford v. Briggs, 444 ___ ____ ________ ______ U.S. 527, 544 (1980) (distinguishing between individual and official capacity claims for purposes of venue determination); Ex __ Parte Young, 209 U.S. 123, 159 (1908) (distinguishing between ____________ individual and official capacity acts for Eleventh Amendment purposes); Northeast Fed. Credit Union v. Neves, 837 F.2d 531, ____________________________ _____ 534 (1st Cir. 1988) (distinguishing between individual and official capacity claims for jurisdictional purposes); Pelkoffer _________ v. Deer, 144 B.R. 282, 285-86 (W.D. Pa. 1992) (applying same ____ distinction in bankruptcy context); see also Graham, 473 U.S. at ___ ____ ______ 165 (indicating differences between individual and official capacity claims for purposes of suit under 42 U.S.C. 1983); Estabrook v. Wetmore, 529 A.2d 956, 958 (N.H. 1987) (applying _________ _______ doctrine that acts of a corporate employee performed in his corporate capacity generally do not form the basis for personal jurisdiction over him in his individual capacity). The ubiquity of the distinction is a reflection of the reality that individuals in our complex society frequently act on behalf of other parties a reality that often makes it unfair to credit or blame the actor, individually, for such acts. At the same time, the law strikes a wise balance by refusing automatically to saddle a principal with total responsibility for a representative's conduct, come what may, and by declining 20 mechanically to limit an injured party's recourse to the principal alone, regardless of the circumstances. Appellant suggests that policy considerations counsel against giving credence to the distinction between a corporate officer's personal and representative capacities. He asserts that, by honoring the distinction, we will enable wily plaintiffs to circumvent arbitration provisions to which they previously had agreed. To prevent such end runs, appellant says, agents and employees must be allowed to stand in the principal's stead for the purpose of invoking arbitration clauses. See Arnold, 920 ___ ______ F.2d at 1281. We believe that policy considerations, placed in proper perspective, tilt in the opposite direction. For one thing, to the extent that appellant's professed fear of artful pleading is genuine, the best preventative is to act before, rather than after, the fact; to be blunt, judicial ______ _____ juggling is a far less effective anodyne than skillful drafting of contract documents in the first instance. A corporation that wishes to bring its agents and employees into the arbitral tent can do so by writing contracts in general, and arbitration clauses in particular, in ways that will specify the desired result. See, e.g., Roby, 996 F.2d at 1361. ___ ____ ____ For another thing, whether a claim properly lies against a party in his personal capacity or in his official capacity is ultimately a function of the facts, not of pleading techniques alone. Mechanisms exist for dealing with groundless, overstated, or elliptical claims. See, e.g., Fed. R. Civ. P. 11; ___ ____ 21 28 U.S.C. 1927 (1988) (granting courts the power to charge "excess costs, expenses, and attorneys' fees reasonably incurred" due to "unreasonabl[e] and vexatious[]" conduct); Cruz v. Savage, ____ ______ 896 F.2d 626, 631-32 (1st Cir. 1990); see also Chambers v. NASCO, ___ ____ ________ ______ Inc., 111 S. Ct. 2123, 2131-38 (1991) (discussing federal court's ____ inherent power to impose sanctions for abusive litigation practices); Foster v. Mydas Assocs., Inc., 943 F.2d 139, 141-45 ______ ____________________ (1st Cir. 1991) (discussing range of sanctions available for prosecution of frivolous claims). Third, we are doubtful that the incentive to plead deceitfully exists at all. Arbitration is almost invariably a creature of contract, and an agent is not ordinarily liable for his principal's breach of contract. See, e.g., Mastropieri v. ___ ____ ___________ Solmar Constr. Co., 553 N.Y.S.2d 187, 188 (App. Div. 1990) ("It __________________ is well settled that when an agent acts on behalf of a disclosed principal, the agent will not be personally liable for a breach of the contract, unless there is clear and explicit evidence of the agent's intention to be bound."); see also Restatement ___ ____ (Second) of Agency 328 (1958) ("An agent, by making a contract only on behalf of a competent disclosed . . . principal whom he has power so to bind, does not thereby become liable for its nonperformance."). Thus, manipulating the reality of events in order to bring suit against the agent holds only marginal promise of financial reward. Perhaps most important from a policy standpoint, adopting appellant's proposal would introduce a troubling 22 asymmetry into the law. It is common ground that "[s]igning an arbitration agreement as agent for a disclosed principal is not sufficient to bind the agent to arbitrate claims against him personally." Flink v. Carlson, 856 F.2d 44, 46 (8th Cir. _____ _______ 1988);14 accord Interocean Ship. Co. v. Nat'l Ship. & Trading ______ _____________________ ______________________ Corp., 523 F.2d 527, 538 (2d Cir. 1975), cert. denied, 423 U.S. _____ _____ ______ 1054 (1976); see also Restatement (Second) of Agency 320. In ___ ____ appellant's scenario, then, the agent, though he could not be compelled to arbitrate, nonetheless could compel the claimant to submit to arbitration. In other words, an agent for a disclosed principal would enjoy the benefits of the principal's arbitral agreement, but would shoulder none of the corresponding burdens. He would have found a way, contrary to folklore, to run with the hare and hunt with the hounds. In our view, judges should think long and hard before endorsing a rule that will allow a party to use the courts to vindicate his rights while at the same time foreclosing his adversary from comparable access. Here, for instance, appellant insists that the law empowers him to shunt McCarthy's claims into an arbitral forum, despite the fact that, if the shoe were on the other foot, ____________________ 14We reject Azure's contention that the Eighth Circuit significantly narrowed Flink's rule in Lee, 983 F.2d at 887. As _____ ___ we read these cases, an agent's signature on behalf of a disclosed principal "is not sufficient" to bind the agent to __________ arbitrate claims against him personally. Flink, 856 F.2d at 46 _____ (emphasis supplied). Lee left this legal rule fully intact. ___ Lee, unlike Frank, merely involved the by-now routine investment ___ _____ service contract context, a situation where additional factors, __________ including "the plain language of the arbitration clause," showed that claims against the agent appropriately were subject to arbitration. Lee, 983 F.2d at 887. ___ 23 McCarthy could not force appellant to arbitrate those claims or any other claims, for that matter. Though the law is not always perfectly proportional, this lack of mutuality of obligation is disturbing, particularly as it arises in a contractual context. See generally Crellin Technologies, Inc. v. Equipmentlease Corp., ___ _________ __________________________ ____________________ ___ F.3d ___, ___ (1st Cir. 1994) [No. 93-1615, slip op. at 15] (discussing rule that mutuality of obligation is a prerequisite to a binding bilateral contract; citing numerous cases and other authorities); Smith, Batchelder & Rugg v. Foster, 406 A.2d 1310, ________________________ ______ 1312 (N.H. 1979). 4. The Nature of the Claims. It is also worth noting, 4. The Nature of the Claims. ________________________ for the sake of completeness, that the bulk of plaintiff's claims are litigable in any event simply because they fall outside the ambit of the Purchase Agreement's closely tailored arbitration clause. For example, the claims for breach of contract and wrongful discharge concern plaintiff's employment rights. Those rights are not mentioned at all in the Purchase Agreement. To the contrary, they come within the purview of the Employment Letter a document that conspicuously omits any arbitration provision. Similarly, many aspects of plaintiff's claims of fraud, misrepresentation, emotional distress, unfair trade practices, and racketeering relate to his employment rights, and, to that extent, also do not implicate the Purchase Agreement's arbitration provision. And while the remaining claims touch upon the Purchase Agreement, they do not uniformly "aris[e] under" it. No useful purpose would be served by reciting book and 24 verse. It suffices to say that, even if Azure were a party to the contract that contains the operative arbitration provision, he would not be entitled as of right to an order staying litigation of all or even most of McCarthy's claims. See 9 ___ U.S.C. 3.15 D. Appellant's Third-Party Beneficiary Theory. D. Appellant's Third-Party Beneficiary Theory. __________________________________________ Appellant next posits that, as a third-party beneficiary of the Purchase Agreement's arbitration clause, he can compel plaintiff to arbitrate. This claim also fails. As is generally the case in matters of contract interpretation, "[t]he crux in third-party beneficiary analysis . . . is the intent of the parties." Mowbray v. Moseley, _______ ________ Hallgarten, Estabrook & Weeden, 795 F.2d 1111, 1117 (1st Cir. _______________________________ 1986). Because third-party beneficiary status constitutes an exception to the general rule that a contract does not grant enforceable rights to nonsignatories, see, e.g., Arlington Trust ___ ____ _______________ Co. v. Estate of Wood, 465 A.2d 917, 918 (N.H. 1993), a person ___ ______________ aspiring to such status must show with special clarity that the contracting parties intended to confer a benefit on him. See ___ Mowbray, 795 F.2d at 1117; Arlington Trust, 465 A.2d at 918; _______ _______________ Tamposi Assocs. v. Star Mkt. Co., 406 A.2d 132, 134 (N.H. 1979); _______________ _____________ see generally 3 E. Allan Farnsworth, Farnsworth on Contracts ___ _________ _______________________ ____________________ 15Of course, the district court in its discretion could stay litigation of nonarbitrable claims pending the outcome of an arbitration proceeding. See Moses H. Cone, 460 U.S. at 20 n.23; ___ ______________ see also Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 856 ___ ____ _____________ __________________ (2d Cir. 1987) (recommending stay of nonarbitrable claim when the arbitrable claim predominates and the nonarbitrable claim is of questionable merit). 25 10.3, at 22-23 (1990); 4 Arthur Corbin, Contracts 776 (1951). _________ In this instance, we are unable to discern any indication in the Purchase Agreement that the parties meant to make their respective agents or employees third-party beneficiaries. Neither Azure nor any other employee of Theta II is mentioned explicitly in the Purchase Agreement; there are no meaningful categorical references; the critical provision in the contract, see supra note 11, omits any mention of agents and ___ _____ employees; and we can find no principled basis for including Azure by necessary implication (especially since the contract contains an integration clause). These facts strongly militate against conferring third-party beneficiary status upon a corporate officer with respect to arbitration rights. See ___ Shaffer v. Stratton Oakmont, Inc., 756 F. Supp. 365, 369 (N.D. _______ ______________________ Ill. 1991) (refusing to find a third-party beneficiary relationship generating an obligation to arbitrate in analogous circumstances); Lester v. Basner, 676 F. Supp. 481, 484-85 ______ ______ (S.D.N.Y. 1987) (refusing to find an obligation to arbitrate under a third-party beneficiary theory when the contract itself "is silent as to whether [its] terms" apply to the purported third-party beneficiaries). The record is equally devoid of anything that might intimate a course of dealing between McCarthy, Theta II, and Azure from which an intent to create third-party beneficiaries plausibly could be inferred. See Mowbray, 795 F.2d at 1117. ___ _______ And, finally, the Purchase Agreement neither calls for any 26 performance by the promisor (McCarthy) that will satisfy some obligation owed by the promisee (Theta II) to the putative third party, nor is it "so expressed as to give the promisor reason to know that a benefit to a third party is contemplated by the promisee as one of the motivating causes of his making the contract." Tamposi, 406 A.2d at 134.16 _______ To say more would be to polish a star. For the reasons indicated, appellant's thrust for relief on the ground that he is a third-party beneficiary of Theta II's agreement to arbitrate falls short. See Mowbray, 795 F.2d at 1117; Shaffer, 756 F. ___ _______ _______ Supp. at 369; Lester, 676 F. Supp. at 485; Tamposi, 406 A.2d at ______ _______ 134. E. Appellant's Alter Ego Theory. E. Appellant's Alter Ego Theory. ____________________________ McCarthy's complaint alleges, at one point, that Azure is the alter ego of Theta II. The last shot in appellant's sling derives from this allegation: he asseverates that he should be accorded the right to demand arbitration based on the asserted equivalence between him and his corporate principal. This shot exhibits a basic misunderstanding of the weapon appellant has selected. Not surprisingly, it misses the mark. The alter ego doctrine is equitable in nature. See, ___ e.g., Harrell v. DCS Equip. Leasing Corp., 951 F.2d 1453, 1458 ____ _______ _________________________ (5th Cir. 1992); St. Paul Fire & Marine Ins. Comp. v. Pepsico, ___________________________________ ________ Inc., 884 F.2d 688, 697 (2d Cir. 1989); 1 Fletcher, supra, ____ _____ ____________________ 16These requirements are not satisfied merely because a third party will benefit from performance of the contract. See ___ Arlington Trust, 465 A.2d at 918-19. _______________ 27 41.25. As such, the doctrine can be invoked "only where equity requires the action to assist a third party." 1 Fletcher, supra, _____ at 41.10; see also In re Rehabilition of Centaur Ins. Co., 606 ___ ____ _______________________________________ N.E.2d 291, 296 (Ill. App. Ct. 1992) (barring a subsidiary from piercing its own corporate veil in order to reach its parent because "the equitable remedy lies with third parties"), aff'd, _____ 1994 WL 28672 (Feb. 3, 1994); Village Press, Inc. v. Stephen ____________________ _______ Edward Comp., Inc., 416 A.2d 1373, 1375 (N.H. 1980) (holding ___________________ that, to employ the alter ego doctrine, "the plaintiff must establish that the corporate entity was used to promote an injustice or fraud"). The case law that appellant touts earns him no indulgence. Without exception, these cases involve instances in which an allegedly aggrieved party has sought to compel a person or entity thought to be a corporate signatory's alter ego to abide by an arbitration clause. Typical of the genre is Fisser, ______ a case holding that "if the parent is bound to the contract, then its marionette [the alleged alter ego] is bound to submit to arbitration." 282 F.2d at 234-35. We are confronted with a much different situation. In this case, the supposed wrongdoer seeks to invoke the alter ego doctrine in order to hide behind the corporate entity, that is, to avail himself of the corporation's right to repair to an arbitral forum and thereby avoid a jury trial. As appellant is not even arguably an innocent third party disadvantaged by someone else's blurring of the line between a corporation and the 28 person who controls it, but, rather, is himself the one who is claimed to have obscured the line, he cannot be permitted to use the alter ego designation to his own behoof.17 III. CONCLUSION III. CONCLUSION We need go no further. Although the Purchase Agreement does contain an arbitration clause, it is narrow in scope and does not extend the right to compel arbitration to agents or employees of the corporate signatory. By like token, the Purchase Agreement does not make manifest an intention to confer third-party beneficiary status on any such agents or employees. And, finally, appellant cannot rely on plaintiff's alter ego claim to draw an equivalence between himself and his corporate principal for his own benefit. In sum, there is no contractual or other legal lever by which appellant can force plaintiff to arbitrate the "individual capacity" claims that are the subject of the underlying suit. Because this is so, the district court appropriately refused to grant the relief that appellant requested.18 ____________________ 17We note that, although plaintiff has alleged that appellant is the alter ego of Theta II, appellant has never admitted the truth of the allegation. While not necessary to our decision, we are impelled to remark the obvious: it would be strange if an equitable doctrine could be construed to allow a party, on one hand, to resist the characterization that he is a corporation's alter ego, and, on the second hand, to allow him simultaneously to use that characterization as a device to sidetrack the characterizer's suit. 18On remand, the district court, by appropriate order, should conform plaintiff's complaint to the representations made in this court, see supra note 4, dismissing any claims asserted ___ _____ against Azure in a representative capacity and striking all related references from the complaint. 29 The order appealed from is affirmed and the case is The order appealed from is affirmed and the case is _______________________________________________________ remanded to the district court for further proceedings. The remanded to the district court for further proceedings. The __________________________________________________________ ___ motions pending in this court are denied without prejudice to motions pending in this court are denied without prejudice to _________________________________________________________________ their renewal below. Costs in favor of appellee. their renewal below. Costs in favor of appellee. ___________________ __________________________ 30