Rechberger v. BioSan Lab.          CV-96-044-JD  07/26/97

UNITED STATES DISTRICT COURT FOR THE
                        DISTRICT OF NEW HAMPSHIRE


Alfred Rechberger, et al.

     v.                              Civil No. 96-044-JD

BioSan Laboratories, Inc., et al.


                              O R D E R


     The plaintiffs, ARC Partners, Ltd. ("ARC") and its general

partner Alfred Rechberger, bring this diversity action against

the defendants, BioSan Laboratories, Inc. ("BioSan"), John Bragg,

and Carl Jackson, to recover losses arising from the defendants'

failure to comply with the terms of a stock purchase agreement, a

consulating agreement, a promissory note, and a guaranty.  The

defendants deny liability and have asserted a variety of

affirmative defenses and counterclaims.  Before the court is the

defendants' motion to stay pending arbitration (document no. 13).


                             Background

I.   The Transaction

     This case arises out of a December 8, 1989, stock purchase

agreement ("Stock Agreement") in which JB Acquisition, Inc.

purchased defendant Rechberger's interest in three companies,

Essential Organics, Inc., Bio + San Laboratories, Inc., and Ortho

Molecular Nutrition International Corporation.  JB Acquisition

signed a promissory note to Rechberger for $1.35 million as partial consideration for the stock purchase.[1]  Defendant BioSan is the successor in interest to JB Acquisition.  Individual defendants John Bragg and Carl Jackson each personally guaranteed JB Acquisition's promissory note.  The stock agreement was signed by Rechberger, Jackson in his capacity as president of JB Acquisition, and Jackson and Bragg in their individual capacities.  In 1990 Rechberger transferred his rights to royalty payments and payments under the note to ARC Partners.

The stock agreement contains the following provision:

10.19  Arbitration. Any disputes arising under or correction [sic] with this Agreement shall be submitted for arbitration pursuant to a panel of three (3) arbitrators acting pursuant to the Rules of the American Arbitration Association sitting at Boston, Massachusetts.  The award of the arbitration panel shall be final, binding and non-renewable, and either party may seek enforcement of the award by any court of competent matter jurisdiction.

Stock Agreement at 52, ¶ 10.19.  The agreement also provides:

10.5  Jurisdiction; Agents for Service of Process.  Any judicial proceedings brought against any of the parties to this Agreement on any dispute arising out of this Agreement or any matter related hereto may be brought in the courts of the State of New Hampshire or in the United States District Court for the District of New

[1]As additional consideration, JB Acquisition agreed to pay Rechberger annual royalties for ten years based on a certain percentage of the combined net sales generated by the sold companies.  The parties also executed an employment agreement under which Rechberger would provide consulting services for the defendants at a set annual salary, adjustable for inflation.

Hampshire, and, by execution and delivery of this Agreement, each of the parties to this Agreement accepts for himself or itself the exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement. . . . The foregoing consents to jurisdiction and appointments of agents to receive service of process . . . shall not be deemed to confer rights on any Person other than the respective parties to this Agreement; and shall not bar collateral proceedings of attachment or in the execution of judgment in other jurisdictions.

Id. at 48-49, ¶ 10.5. Finally, the agreement provides that matters related to contractual "interpretation and construction . . . shall be governed by the laws of the State of New Hampshire." Id. at 48, ¶ 10.4.

II. The Dispute

The plaintiffs allege that BioSan defaulted on the note in 1993. To avoid acceleration of the note, the individual defendants personally guaranteed all royalty payments and consulting fees due Rechberger and ARC partners under the employment and the stock agreements. Complaint at ¶ 17.

In November 1994, a BioSan employee, Marion Jacobi, filed a personal injury lawsuit in New Hampshire state court against Rechberger and one of the companies sold to the defendants in 1989. Id. at ¶ 20. In May 1994, the state court ordered BioSan to hold as trustee all payments due Rechberger and ARC Partners. Although never named as a principal defendant, BioSan paid Jacobi

3

$40,000 as a settlement of any potential claims.  Id.  Jacobi's state court action against Rechberger and ARC Partners is still pending.  Id.

The relationship between the parties deteriorated during 1995 and at some point the defendants allegedly withheld payments due the plaintiffs.  In correspondence and, more recently, in counterclaims the defendants have asserted, inter alia, that Rechberger violated the stock agreement by not disclosing the facts and circumstances underlying the state court litigation, failing to perform under the consulting agreement, misrepresenting important product information, and breaching other terms of the parties' agreements.

By correspondence of December 7, 1995, and January 16, 1996, counsel for the defendants stated their intent to arbitrate the dispute.  The plaintiffs filed the instant federal court action on January 23, 1996.

## Discussion

In their motion, the defendants assert that the stock agreement's arbitration clause is binding on the parties and, as such, the court should stay this action pending arbitration.  The plaintiffs respond that the arbitration clause, when read in concert with the forum selection clause and other provisions,

4

does not require arbitration.  In the alternative, the plaintiffs argue that even if the arbitration clause is binding on BioSan, it cannot require arbitration of the claims asserted against and by the individual defendants.

The Federal Arbitration Act ("FAA") provides that

> a written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof . . . shall be valid, irrevocable, and enforceable, save upon grounds as exist at law or equity for the revocation of any contract.

9 U.S.C.A. § 2 (West 1970).  "[T]he basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate." Painewebber, Inc. v. Landay, 903 F. Supp. 193, 196 (D. Mass. 1995) (quoting Allied-Bruce Terminix Cos. v. Dobson, 115 S. Ct. 834, 838 (1995)); see also Painewebber Inc. v. Elahi, ___ F.3d ___, 1996 WL 360012 at * 3 (1st Cir. July 3, 1996) ("Section 2 of the FAA 'is a congressional declaration of a liberal federal policy favoring arbitration agreements.'") (quoting Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)).

Consistent with Congress' policy favoring arbitration, federal courts enforce arbitration agreements "even if a rule of state law would otherwise exclude such claims from arbitration." Mastrobuono v. Shearson Lehman Hutton, Inc., 115 S. Ct. 1212,

5

1216 (1995).  The First Circuit, relying on recent Supreme Court precedent, has interpreted the FAA to preempt any state laws which are "specifically and solely applicable to arbitration agreements."  Elahi, ___ F.3d at ___, 1996 WL 360012 at * 3 (citing Doctor's Assocs., Inc. v. Casarotto, 116 S. Ct. 1652, 1655-56 (1996)).  Notwithstanding state contract law principles, questions involving "the interpretation of an arbitration provision touching upon matters of interstate commerce . . . must be resolved according to federal law."  McCarthy v. Azure, 22 F.3d 351, 355 (1st Cir. 1994) (citing McGregor v. Industrial Excess Landfill, Inc., 856 F.2d 39, 46 n.2 (6th Cir. 1988); Letizia v. Prudential Bache Securities, Inc., 802 F.2d 1185, 1187 (9th Cir. 1986)).  The application of federal law does not entirely displace state principles of contract interpretation because the two bodies of substantive law are often similar and, in any event, "federal courts developing federal common law are free to borrow from state law."  McCarthy, 22 F.3d at 355-56 (citing NRM Corp. v. Hercules, Inc., 758 F.2d 676, 681 (D.C. Cir. 1985) ("explaining that contract interpretation, under federal law, 'dovetails precisely with general principles of contract law'")); see also First Options of Chicago, Inc. v. Kaplan, 115 S. Ct. 1920, 1924 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability)

6

courts generally . . . should apply state-law principles that govern the formation of contacts.") (listing cases).

The threshold questions of whether and to what extent parties have privately agreed to arbitrate a dispute "is a matter of the parties' contractual intent." <u>Elahi</u>, ___ F.3d ___, 1996 WL 360012 at * 3 (citing <u>Mastrobuono</u>, 115 S. Ct. at 1216); <u>accord</u> <u>McCarthy</u>, 22 F.2d at 355 (whether a given issue should be resolved by arbitration "is ordinarily a function of the parties' intent as expressed in the language of the contract documents"); <u>ATHR, Inc. v. Hutchinson, Smith, Nolt & Assocs., Inc.</u>, No. 93-467-M, slip op. at 9 (D.N.H. Oct. 12, 1995) (citing New Hampshire law). The court's analysis rests on bedrock principles of contract law, such as the construction of ambiguous language against the party that drafted it and the "cardinal principal of contract construction: that a document should be read to give effect to all its provisions and to render them consistent with each other," <u>Mastrobuono</u>, 115 S. Ct. at 1219 (citing state law authority and <u>Restatement (Second) of Contracts</u> §§ 203(a) & cmt. b, 202(5) (1979)); <u>accord</u> <u>ATHR</u>, slip op. at 9-10 (court interprets contract objectively, considers provisions as a collective whole, and arrives at "a meaning that would be attached to it by a reasonable person") (quoting <u>Kilroe v. Troast</u>, 117 N.H. 598, 601 (1977); citing <u>Logic Assocs. v. Time</u>

Share Corp., 124 N.H. 565, 572 (1984) and Tentindo v. Locke Lake Colony Ass'n, 120 N.H. 593, 598-99 (1980)); see Waterville Co. v. Brox, no. 95-620-SD, slip op. at 5-6 (D.N.H. April 24, 1996) (applying same axioms of contract interpretation). Finally, the court's interpretation of a contract containing an arbitration provision must reflect Congress' strong preference for the arbitration of disputes, see, e.g., 9 U.S.C. § 2, and, for this reason, "any waiver of a mandatory arbitration provision should be explicit," West Shore Pipe Line Co. v. Associated Elec. & Gas Ins. Servs. Ltd., 791 F. Supp. 200, 203-04 (N.D. Ill. 1992).

I.    The Arbitration Clause is Binding and Must be Enforced

The plaintiffs argue that the ¶ 10.19 arbitration clause cannot be enforced because it "cannot be reconciled" with the parties' agreement at ¶ 10.5 to litigate disputes relating to the contract in a state or federal court in New Hampshire. See Plaintiffs' Memorandum of Law in Opposition to Motion to Stay ("Plaintiff's Memorandum") at 2-3. The defendants assert that the stock agreement is not internally inconsistent and, in fact, the two paragraphs operate in concert. See Defendants' Reply Brief at 2-4.

The court finds that the stock agreement, although not a model of draftsmanship, is not ambiguous with respect to the

arbitration issue. Significantly, the plain language of ¶ 10.19 reveals the parties' intent to submit disputes to binding arbitration according to the rules established by the American Arbitration Association. The provision is not qualified and, fairly read, indicates in broad and obligatory language that "any" dispute arising under or in connection with the contract "shall" be resolved through arbitration.

The inclusion of ¶ 10.5, which, inter alia, purports to designate New Hampshire state and federal courts as the exclusive judicial forums, neither defeats the plain language of ¶ 10.19 nor otherwise undermines the parties' contractual obligation to arbitrate. Specifically, ¶ 10.5 does not reference the arbitration provision and, attaching a plain meaning to its terms, merely requires that any legal action between the parties be filed and maintained in a court sitting in this state.[2] Reading the two paragraphs in concert, the court interprets ¶ 10.5 to require that any legal action not properly submitted to arbitration under ¶ 10.19 be filed and maintained in a New Hampshire Court. The paragraphs are not mutually exclusive. For example, in the event that one party refused to arbitrate a

_____

[2]Consistent with this interpretation, ¶ 10.5 also requires the parties to submit to the personal jurisdiction of the New Hampshire state and federal courts and to accept service of process in this state.

dispute under ¶ 10.19, the party seeking to compel arbitration through litigation would be required by ¶ 10.5 to do so in a New Hampshire court. Moreover, ¶ 10.19 itself contemplates a post-arbitration judicial proceeding by providing that the "award of the arbitration panel shall be final . . . and either party <u>may seek enforcement of the award by any court of competent [sic] matter jurisdiction</u>." Stock Agreement at 52, ¶ 10.19 (emphasis supplied). Read jointly with ¶ 10.5, any such judicial action to enforce an arbitration award would be need to be filed in a New Hampshire court.

Accordingly, the court finds that under traditional principles of contract construction the plain and unambiguous language of ¶ 10.19 and ¶ 10.5 must be given effect. <u>See</u> <u>West Shore Pipe Line</u>, 791 F. Supp. at 203-04 (rejecting alleged conflict between mandatory arbitration provision and consent to jurisdiction provision, court reasoned that "arbitration awards are not self-enforceable. Once arbitration is completed, therefore, the forum selection clause reasonably can be interpreted as dictating the <u>location</u> of any action that might be necessary after arbitration to enforce the award.") (emphasis in original) (quoting <u>Geldermann, Inc. v. Stathis</u>, 532 N.E. 2d 366, 370 (Ill. App. Ct. 1988)). As a result, the parties are required to arbitrate this dispute and, if necessary, to maintain any

10

contractually related judicial proceedings in a New Hampshire court.[3]

## II.  The Arbitration Clause Does Not Bind Individual Defendants

The plaintiffs next argue that the arbitration clause, even if enforceable, cannot bind the individual defendants because their obligations under the stock agreement are explicitly limited by ¶ 1.12, which provides:

> 1.12  Execution by Guarantors.  The Guarantors have countersigned this Agreement for the sole purpose of obligating themselves (i) to execute the Guarantee at Closing; (ii) to make the investment referred to Section 1.10 above and (iii) to consent to choice of law and jurisdiction as set forth in Section 10.9[4] below; and Guarantors shall have no individual liability for any other act, obligation, or commitment arising under this Agreement.

Stock Agreement at 12, ¶ 1.12.  The defendants respond that the plaintiffs' claims against the individual defendants are irrelevant for purposes of determining whether the parties should arbitrate because the individual defendants have been sued for a breach of their guarantees and not for a breach of the stock agreement.

_____

[3]Neither party has argued that the subject matter of this case places it beyond the scope of the arbitration provision and, as such, the court does not consider the issue.

[4]According to the plaintiffs, the reference to "Section 10.9" is erroneous and, instead, the provision should reference "Section 10.5."  See Plaintiffs' Memorandum at 10.

11

The court finds that ¶ 1.12, given its plain and ordinary meaning, is an unambiguous expression of the parties intent to limit the individual defendant's obligations under the stock agreement.  The paragraph's recitation of the "sole purposes" for the individual defendant's signatures, coupled with the disclaimer that they have "no individual liability for any other act, obligation, or commitment" under the agreement, makes clear that Bragg and Jackson are not contractually compelled under ¶ 10.19 to arbitrate their interest in any dispute relating to the stock agreement.[5]  Despite the judiciary's preference for arbitration, the court will not deprive a party of its right to a judicial forum absent an expressed and enforceable agreement to submit to arbitration.  See generally First Options of Chicago, 115 S. Ct. at 1924 ("arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes -- but only those disputes -- that the parties have agreed to submit to arbitration").  Accordingly, the court will not require the individual defendants to arbitrate because such an order would disregard the unambiguous language of the stock agreement.

_____

[5]Parenthetically, the court notes that there is nothing in the stock agreement that would appear to bar the individual defendants from voluntarily submitting to arbitration or any other non-trial resolution of a dispute related to the agreement.

12

This finding does not, however, imperil the motion to stay because the contract places no such limitations on the plaintiffs' obligation to arbitrate. The plaintiffs cannot circumvent the mandatory arbitration provision by also suing individuals who are not bound by the provision. Significantly, each plaintiff is bound to arbitrate: Rechberger signed the agreement and ARC Partners is the successor to certain of Rechberger's rights under the agreement. The fact that two of the defendants are not bound to ¶ 10.19 is inconsequential because at least one defendant, BioSan, is bound and, thus, is entitled to enforce the terms of that paragraph, to its benefit, against the plaintiffs.

The court orders the plaintiffs and defendant BioSan to arbitrate their dispute in accordance with ¶ 10.19 of the stock agreement and to do so promptly. The court urges, but because of ¶ 1.12 cannot require, the individual defendants to voluntarily submit to arbitration as this would avoid the anomalous situation in which a portion of the case is resolved through arbitration while certain remaining issues are addressed in court. However, regardless of whether the claims pending against the individual defendants are presented to the arbitration panel, in the opinion of the court arbitration between the plaintiffs and BioSan is likely to clarify or even resolve key issues raised in this

action.  Accordingly, the court stays the entire case pending arbitration.  See Hewlett-Packard Co., Inc. v. Berg, 61 F.3d 101, 105 (1st Cir. 1995) ("'[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'") (quoting Landis v. North Amer. Co., 299 U.S. 248, 254 (1936)).


## Conclusion

The defendants' motion to stay (document no. 13) is granted.

This action is stayed pending arbitration.  The parties shall file a joint status report every ninety days to inform the court of the progress of this matter.

The clerk shall schedule a status conference.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

July 26, 1996

cc:  Edward L. Hahn, Esquire
     Jill K. Blackmer, Esquire
     Thomas H. Richards, Esquire

14