Alan GREENWALD, Steven Greenwald, John Powers, d/b/a Greenwald, Greenwald & Powers, Plaintiffs, Appellants,

v.

CHASE MANHATTAN MORTGAGE CORPORATION, Defendant, Appellee.

No. 00–1447.

United States Court of Appeals, First Circuit.

Heard Dec. 6, 2000.

Decided March 2, 2001.

Alan Greenwald with whom John D. Powers and Greenwald, Greenwald, Powers & Winsor LLP were on brief pro se.

Gary C. Tepper with whom Arent Fox Kintner Plotkin & Kahn, PLLC was on brief for appellee.

Before BOUDIN, Circuit Judge, CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

BOUDIN, Circuit Judge.

This restitution action has its origin in mortgage refinancing loans acquired by defendant-appellee Chase Manhattan Mortgage Corporation ("Chase") from the now-bankrupt Abbey Financial Corporation ("Abbey"). During the early 1990's, Chase regularly purchased mortgage loans on the secondary mortgage market from independent mortgage companies such as Abbey. At the time of the events in this case, Chase had a contractual right to review Abbey loans and buy those Chase wanted.

In settling some of its loans, Abbey employed as a closing agent the law firm of Greenwald, Greenwald & Powers ("the Greenwald firm"), the plaintiff-appellant in this case. As a closing agent, the Greenwald firm performed routine duties, such as title examinations and preparing paperwork for a closing. Importantly, the Greenwald firm received funds from Abbey, placed them in escrow, and eventually disbursed those funds to various parties, including the holder of the previous mortgage on the property destined to be security for the refinanced loan.

On March 17, 1994, Abbey closed a loan agreement with Robert and Mary Stapleton ("the Stapleton Loan"); on March 18, Abbey made a similar loan commitment to Paul and Kathleen Sachse ("the Sachse Loan"). Because both loans were mortgage refinance loans, federal regulations (designed to protect the borrower) provided that the proceeds of the loans not be disbursed until at least three days after their respective closings. 12 C.F.R. § 226.23(c) (2000) (pursuant to 15 U.S.C. § 1635 (1994)). Shortly after the closings, the Greenwald firm forwarded the borrowers' promissory notes, the closing statements, and other documents to Abbey. Abbey, in turn, forwarded the promissory notes and closing statements to Chase, which received the documents on March 22. On March 24, 1994, Chase wired funds to Abbey to purchase the Stapleton and Sachse loans.

On March 23 and March 24, after the three-day rescission periods had expired, the Greenwald firm received two uncertified checks from Abbey intended to satisfy the prior mortgages on the loans. The Greenwald firm promptly deposited the checks (totaling more than $280,000) in an escrow account and recorded the mortgage deeds. Then, without waiting for Abbey's checks to clear, the firm (on March 23 and 24 respectively), issued checks on its escrow account (one certified and one not) to pay off the Stapletons' and Sachses' previous lenders—whose mortgages would otherwise have had priority over Chase. The checks were sent by Federal Express.

On March 28, 1994, the Greenwald firm received correspondence from Abbey indicating that some of Abbey's previously issued checks might bounce. The Greenwald firm then sought to stop payment on its own checks that relied on Abbey's funds, including those for the Stapleton and Sachse loans. Although the Greenwald firm was able to stop most payments, both the Stapleton and Sachse checks cleared before it could do so. The result

was that the Greenwald firm paid off the prior mortgages with its own money; and Chase, having already purchased the notes from Abbey on March 24, held the loans with enhanced security. On April 1, Abbey filed for bankruptcy.

In March 1997, the Greenwald firm filed suit against Chase in Massachusetts state court. Although the complaint set forth a number of claims, the only claim that remains at issue on this appeal is one for unjust enrichment. Chase removed the case to federal court and obtained summary judgment in its favor on all counts. On this appeal, the Greenwald firm says that summary judgment for unjust enrichment should have been granted in its favor or, in the alternative, that factual issues precluded summary judgment for either side.

■ The district court gave two reasons for resolving the unjust enrichment claim in favor of Chase: first, the court said that while Chase did hold the loans, "[Chase] paid for them" and, consequently, "[a]lthough defendant may be seen to have benefitted from plaintiffs' mistake, it was not enriched thereby and certainly not unjustly enriched." The court also said that the unjust enrichment claim was "defective for lack of any contractual or implied relationship that would lead to a duty to indemnify plaintiffs." We treat the first of these grounds as central; the second appears to involve issues not up on appeal.[1]

■ The underlying issue is an interesting and difficult one. Taking the facts in the light most favorable to the Greenwald firm, the non-moving party, *Landrau–Romero v. Banco Popular De Puerto Rico,*

212 F.3d 607, 611 (1st Cir.2000), the chronology of key events that frame the unjust enrichment issue goes as follows:

● March 22: Chase receives notes and other loan documents.

● March 23 and 24: the Greenwald firm, having received uncertified checks from Abbey, sends escrow account checks to prior mortgagees.

● March 24: Chase wires funds to Abbey to pay for the loan.

● March 28: the Greenwald firm tries to stop its checks to prior mortgagees but they have already cleared.

In a nutshell, the Greenwald firm paid off prior mortgages that burdened the properties that Chase counted on as security for the Stapleton and Sachse refinance loans. Without the Greenwald firm's payments to the prior mortgagees, Chase would have been left with either worthless notes or at least notes with a lesser security interest. Because Abbey's own checks to the Greenwald firm bounced, the Greenwald firm's escrow account payments to the prior mortgagees did cause the Greenwald firm an uncompensated loss and substantially benefitted Chase.[2]

If Chase had paid Abbey for the notes *after* the prior mortgagees had been paid, Chase would have paid value for notes which had full value (we will assume) only because the Greenwald firm had already paid off the prior mortgages. As a purchaser for value, Chase's equitable position would have been very strong, quite apart from its ability to invoke legal protections available to good-faith purchasers. It may have been this way of viewing the situation that led the district court to say that

1. The second ground was likely directed to the Greenwald firm's claims in the district court that there was a contractual or fiduciary relationship between Chase and the Greenwald firm that created a separate duty to indemnify. The district court rejected these claims, and on this appeal, the Greenwald firm relies solely on unjust enrichment, a doctrine that does not require any contractual or fiduciary relationship between the parties.

See *Flower v. Suburban Land Co.,* 332 Mass. 30, 123 N.E.2d 218, 221 (1954).

2. Chase says neither note would have been worthless because Chase would have still held the promissory notes in due course. Even if this is so, Chase would have had a less secure, if not unsecured, claim against the borrower rather than a loan secured by a first mortgage.

Chase had not been "enriched" at all, let alone unjustly so.

The Greenwald firm responds that Chase "had fully paid Abbey for [the Sachse and Stapleton notes] before [the firm] involuntarily funded the mortgage payoffs of the prior loans." In other words, the Greenwald firm says that Chase had already paid its funds to an insolvent recipient (Abbey) and held worthless (or at least less valuable) paper until the Greenwald firm paid off the first mortgages. So viewed, the case looks more like one in which Chase was enriched (whether or not unjustly is a different matter).

Chase claims that Chase paid Abbey for one of the loans *after* the Greenwald firm had paid off the prior mortgage on that loan and that, as to the other loan, the record is unclear. The Greenwald firm sent out its own checks to the prior mortgagees on March 23 and 24; Chase wired its funds to Abbey on March 24; but the Greenwald firm could probably have stopped payment on one of the checks (the other was certified) after Chase wired the funds, and the checks probably did not clear until after Chase had paid Abbey. Thus, we assume for the purpose of summary judgment that Chase paid Abbey for the loans (or at least one of them) before the Greenwald firm paid off the mortgage.

With qualifications, this puts Chase in the position (or nearly so) of one who receives a third party's payment on a valid debt—but a debt on which the lender would otherwise not be able to collect from the insolvent debtor. The only difference is that the payments that benefitted Chase were made to a third party (the prior mortgagees) rather than directly to Chase. If the person who had paid off the loan had acted on a mistake of fact, he might seek restitution from the lender. Would he win?

■ Massachusetts courts commonly invoke the *Restatement of Restitution* (1936), although they have not followed it slavishly.[3] The *Restatement* has two different sections that hone in on this problem. One, section 13, deals with a bona fide purchaser for value; and the other, section 14, concerns a creditor or lienor who benefits when the debt or lien is discharged by a third party who acts under a mistake as to his interests or duties. With qualifications not relevant here (*see* note 6, below), both sections conclude that the beneficiary (the acquirer in one case and the creditor/lienor in the other) need not make restitution.[4] The pertinent sections are reprinted in full in an appendix to this opinion.

Section 14, dealing with discharges for value, is more clearly on point because its illustrations make it evident that the discharge of the antecedent debt *is* value. This is suggested by text and borne out by illustrations. The clearest is this: "Believing that he owns Blackacre, A pays the taxes thereon, to the city of B. A is not entitled to restitution from B." *Restatement* § 14 cmt. b, illus. 2. Similarly, "A, under the erroneous belief that he has effectively promised B to pay C's debt to him, makes payment thereof to B. He is not entitled to restitution from B." *Id.* § 14 cmt. b, illus. 5.

3. *See, e.g., Keller v. O'Brien*, 425 Mass. 774, 683 N.E.2d 1026, 1029 (1997); *National Shawmut Bank v. Fidelity Mut. Life Ins. Co.*, 318 Mass. 142, 61 N.E.2d 18, 22 (1945); *see also Michelin Tires (Canada) Ltd. v. First Nat'l Bank of Boston*, 666 F.2d 673, 680 (1st Cir. 1981). The *Restatement (Third) of Restitution and Unjust Enrichment* ("*Third Restatement*") (there was no completed *Second*) is still only in draft form.

4. Section 110 of the *Restatement* deals with a related situation in which one person has agreed with a second person to perform a contractual duty of the latter in exchange for consideration, and, by performing that duty, confers a benefit on a third party. Consistent with sections 13 and 14, section 110 states that the first person is not entitled to restitution from the third party, should the second person fail to provide the agreed consideration to the first. *Restatement* § 110.

In these cases, denial of restitution is debatable. Absent some kind of reliance by the creditor, one might think that the creditor ought to make restitution to the person who mistakenly paid off the debt (*e.g.*, that city B should repay A). But the *Restatement* position is also defensible. There was a real debt to the creditor; the person now seeking restitution *chose* to pay it off; and the creditor got only what was due to him. A close case perhaps, but close cases have to be decided one way or the other. The *Restatement* favors Chase and affirmance.

The Greenwald firm makes no effort to distinguish the general principle derived from the *Restatement* but instead cites us to *National Shawmut Bank v. Fidelity Mutual Life Insurance Co.*, 318 Mass. 142, 61 N.E.2d 18 (1945). The facts of that case are complicated, but a simplified version will do. Based on a forged application, Fidelity made a loan to the forger on the security of an insurance policy owned by a third party; and, when the forger refinanced the loan with Shawmut, Shawmut paid Fidelity to discharge the loan, leaving the policy (or so Shawmut thought) to secure the refinance loan. When the facts emerged, Shawmut sought restitution from Fidelity, and the Supreme Judicial Court upheld this claim on the ground that Shawmut's discharge payment unjustly enriched Fidelity.

The SJC began with the general rule, from Williston, *Contracts* § 1574, at 494–95 (Walter H.E. Jaeger ed., 3d ed.1970), and section 14 of the *Restatement*, that one who pays off a valid loan owed by a debtor to a creditor cannot recover from the creditor even though the payment was made under a mistake of fact. Without disavowing the rule, the court found it inapplicable in the Shawmut–Fidelity transaction because the mortgage that

Shawmut discharged was *not* valid, the application to Fidelity for the original mortgage having been made by a forger and not by an owner of the policy. *National Shawmut*, 61 N.E.2d at 22.

On our reading of *Shawmut*, the case turned on the fact that the payment sought to be recovered did not discharge a valid mortgage but a counterfeit one. There is a brief (and general) passage later in the decision that is more helpful to the Greenwald firm,[5] and the SJC, relying upon Williston, did override one illustration in the *Restatement* dealing with a forged mortgage, *Restatement* § 14 comment b, illustration 7. *National Shawmut*, 61 N.E.2d at 21–23. But see *Associates Disc. Corp. v. Clements*, 321 P.2d 673, 676 (Okla.1958) (the "weight of authority" favors the *Restatement* result). Nevertheless, on the central ground given by the SJC, the *Shawmut* case is different because it involves payment on a nonexistent debt premised on a forged instrument, not the mistaken discharge of a valid debt.

Chase might well win even if *Shawmut* were read otherwise. There is some indication that Chase paid Abbey only after receiving closing documents from the Greenwald firm that could be read as representing that the prior mortgages had been discharged or at least would be discharged by March 24, the date that Chase paid Abbey. If so, there could be real reliance and not merely passive receipt of a benefit. However, given factual uncertainties, we cannot be sure of the premise and do not rely upon this alternative ground.

Chase and the Greenwald firm each blame the other for taking risks, if not for actual negligence. The Greenwald firm points to Chase's payment to Abbey before receiving firm proof that the prior mort-

---

5. The SJC's primary discussion cited Williston's treatise as stressing that in the case of the forged mortgage "there was no mortgage or mortgage debt, due from anyone to the defendant, but only the counterfeit appearance thereof." *National Shawmut*, 61 N.E.2d at 22 (quote from Williston, *supra*, § 1574, at 496 n.11) (internal quotation marks omitted). However, in closing the court described the general rule as that "one receiving money of another without just right to it must restore it." *Id.* at 23.

gages had been discharged; and the Greenwald firm says that Chase speeded up the mortgage process for its own benefit and had some reason to know that Abbey was on shaky ground. In response, Chase says that the Greenwald firm had even better reason to know of Abbey's condition, and that it "enabled" its own loss by paying out escrow funds before Abbey's checks had cleared.

Neither side has made much effort to develop the rules and the precedents as to the role of risk assumption or negligence in fostering or limiting an unjust enrichment claim; and the law on this point is far from straightforward. *Restatement* § 59 cmt. a. However, section 14 of the *Restatement* is explicit: so long as the creditor or lienor "made no misrepresentation and did not have notice of the transferor's mistake," there is no duty of restitution. Here, there is no charge of misrepresentation by Chase, nor did it receive any benefits knowing that the benefits were paid by mistake.[6]

The Greenwald firm offers an alternative argument based on equitable considerations: Chase should bear the loss because it stood to profit from the refinancing whereas the Greenwald firm was merely acting as an agent and had a far smaller interest in the transaction. In effect, the Greenwald firm says that because Chase sought to profit from purchasing one billion dollars worth of loans, it should now absorb the loss caused by Abbey's bankruptcy regardless of which party (Chase or the Greenwald firm) is at fault.

The origins of unjust enrichment actions largely lie in equity. *Restatement* pt. I, intro. note. To some degree, restitution decisions thus reflect a weighing of whether an outcome is more or less "fair" or "just." Kull, *Rationalizing Restitution*, 83 *Cal. L.Rev.* 1191, 1235–36 (1995). Nev-ertheless, as the *Restatement* sections demonstrate, restitution "rules" have been adopted despite the fact that in a particular situation they might lead to what could arguably be a less equitable outcome. *Restatement* § 13 cmt. a. The Greenwald firm's equitable arguments cannot displace the specifically articulated principle at work in section 14 of the *Restatement*.

Admittedly, section 14 is not a perfect fit because the case it addresses is one in which the allegedly enriched defendant, from whom restitution is sought, is the holder of the valid debt mistakenly discharged; in our case, of course, the person in this position is the original mortgagee, and Chase is merely a secondary beneficiary whose own security has presumably advanced from second to first priority as a result of the discharge. However, no one has attempted to show us why this should matter; and the fact that Chase received nothing directly from the Greenwald firm seems as much to help its position as to hurt it. *See* note 4, above.

Nothing has been said so far of the holder-in-due-course doctrine or of UCC provisions in Massachusetts, both of which have been invoked by Chase. The reason is that Chase has made no serious effort to show just how the doctrine and provisions apply in this case and has briskly treated the promissory notes as subject to good-faith purchaser protection even though, as discussed above, the critical issue appears to be the discharge of the prior *mortgages*. Whether these ancillary arguments can do some other litigant any good can await a future case. It is enough here that, by a close margin, standard restitution law favors Chase.

The judgment of the district court is *affirmed*. Each side shall bear its own costs on this appeal.

---

6. Both sections 13 and 14 declare that the general rule does not apply if the beneficiary had notice of the mistake. However, the Greenwald firm disclaims any allegation that Chase knew that Abbey's checks would bounce, and, even if credited, the firm's allegations that Chase had notice of Abbey's questionable financial condition lack sufficient specificity to establish the required notice, *see Michelin Tires*, 666 F.2d at 682–83.

## APPENDIX

*Restatement (First) of Restitution* (1936)

§ 13. Bona Fide Purchaser

A person who has entered into a transaction with another under such circumstances that, because of a mistake, he would be entitled to restitution from the other,

(a) is not entitled to restitution from a third person who has received title to or a legal interest in the subject matter either from the other or from the transferor at the direction of the other, and has given value therefor without notice of the circumstances;

(b) is entitled to restitution from a third person who had notice of the circumstances before giving value or before receiving title or a legal interest in the subject matter.

§ 14. Discharge for Value

(1) A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

(2) An assignee of a non-negotiable chose in action who, having paid value therefor, has received payment from the obligor is under no duty to make restitution although the obligor had a defense thereto, if the transferee made no misrepresentation and did not have notice of the defense.