The Commonwealth of
MASSACHUSETTS,
Plaintiff,

v.

MYLAN LABORATORIES,
et al., Defendants.

No. CIV.A.03–11865–PBS.

United States District Court,
D. Massachusetts.

Feb. 4, 2005.

Richard C. Heidlage, Attorney General's
Office, Commonwealth of Massachusetts,

Nicholas J. Messuri, Attorney General's Office, Boston, MA, for The Commonwealth of Massachusetts, Plaintiff.

David S. Nalven, Boston, MA, for The Commonwealth of Massachusetts, Plaintiff.

Robert P. Patten, Attorney General's Office, Boston, for The Commonwealth of Massachusetts, Plaintiff.

Justin S. Antonipillai, Arnold & Porter, Washington, DC, for Ethex Corporation, Defendant.

Scott A. Birnbaum, Birnbaum & Godkin, LLP, Boston, MA, for Ethex Corporation, Defendant.

Jonathan D. Cohen, Greenberg Traurig, LLP, Boston, MA, for Mylan Laboratories, Inc., Defendant.

Jenny K. Cooper, Bingham McCutchen, LLP, Boston, MA, for Dey, Inc., Defendant.

Richard M. Cooper, Williams & Connolly LLP, Washington, DC, for Par Pharmaceuticals, Inc., Defendant.

Michael R. Costa, Greenberg Traurig, LLP, Boston, MA, for Mylan Laboratories, Inc., Defendant.

Paul J. Coval, Vorys, Sater, Seymour and Pease, LLP, Columbus, OH, for Roxane Laboratories, Inc., Defendant.

Stephen R. Delinsky, Eckert Seamans Cherin & Mellott, LLC, Boston, MA, for Par Pharmaceuticals, Inc., Defendant.

Paul K. Dueffert, William & Connolly, LLP, Washington, DC, for Par Pharmaceuticals, Inc., Defendant.

John R. Fleder, Hyman, Phelps & McNamara, P.C., Washington, DC, for Purepac Pharmaceutical, Co., Defendant.

Evan Georgopoulos, Greenberg Traurig, LLP, Boston, MA, for Mylan Laboratories, Inc., Defendant.

Ameer F. Gopalani, Arnold & Porter LLP, Washington, DC, for Ethex Corporation, Defendant.

Gary R. Greenberg, Greenberg Traurig, LLP, Boston, MA; for Mylan Laboratories, Inc., Defendant.

Drew A. Harker, Arnold & Porter, Washington, DC, for Ethex Corporation, Defendant.

Alan M. Kirschenbaum, Hyman, Phelps & McNamara, P.C., Washington, DC, for Purepac Pharmaceutical, Co., Defendant.

Robert S. Litt, Arnold & Porter, Washington, DC, for Ethex Corporation, Defendant.

Jeffrey E. Marcus, Eckert Seamans Cherin & Mellott, LLC, Boston, MA, for Par Pharmaceuticals, Inc., Defendant.

James W. Matthews, Sherin and Lodgen LLP, Boston, MA, for Teva Pharmaceuticals USA, Inc., Defendant.

Kirsten V. Mayer, Ropes & Gray, Boston, MA, for Warrick Pharmaceuticals Corporation, Defendant.

Andrew R. McConville, Eckert Seamans Cherin & Mellott, LLC, Boston, MA, for Par Pharmaceuticals, Inc., Defendant.

Darrell A.H. Miller, Vorys, Sater, Seymour and Pease, LLP, Columbus, OH, for Roxane laboratories, Inc., Defendant.

Anthony M. Moccia, Eckert Seamans Cherin & Mellott, LLC, Boston, MA, for Par Pharmaceuticals, Inc., Defendant.

John T. Montgomery, Ropes & Gray LLP, Boston, MA, for Warrick Pharmaceuticals Corporation, Defendant.

Robert J. Muldoon, Jr., Sherin & Lodgen LLP, Boston, MA, for Teva Pharmaceuticals USA, Inc., Defendant.

Martin F. Murphy, Bingham McCutchen LLP, Boston, MA, for Dey, Inc., Defendant.

Brien T. O'Connor, Ropes & Gray LLP, Boston, MA, for Warrick Pharmaceuticals Corporation, Defendant.

Christopher C. Palermo, Kelley Drye & Warren LLP, New York City, for Dey, Inc., Defendant.

A. John Pappalardo, Greenberg Traurig, LLP, Boston, MA, for Mylan Laboratories, Inc., Defendant.

Philip D. Robben, Kelley Drye & Warren LLP, New York City, for Dey, Inc., Defendant.

Douglas L. Rogers, Vorys, Sater, Seymour and Pease, LLP, Columbus, OH, for Roxane laboratories, Inc., Defendant.

Louis J. Scerra, Jr., Greenberg Traurig, LLP, Boston, MA, for Mylan Laboratories, Inc., Defendant.

John W. Steinmetz, Robinson & Cole, Boston, MA, for Roxane Laboratories, Inc., Defendant.

T. Reed Stephens, Sonnenschein Nath & Rosenthal LLP, Washington, DC, for Teva Pharmaceuticals USA, Inc., Defendant.

John R. Therien, Ropes & Gray LLP, Boston, MA, for Warrick Pharmaceuticals Corporation, Defendant.

Robert M. Thomas, Jr., Thomas & Associates, Boston, MA, for Purepac Pharmaceutical, Co., Schein Pharmaceutical, Inc., Watson Pharmaceuticals, Inc., Defendants.

Mary Kate Whalen, Hyman, Phelps & McNamara, P.C., Washington, DC, for Purepac Pharmaceutical, Co., Watson Pharmaceuticals, Inc., Defendants.

Pamela A. Zorn, Sherin and Lodgen LLP, Boston, MA, for Teva Pharmaceuticals USA, Inc., Defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

## I. INTRODUCTION

The Commonwealth of Massachusetts brings this case against thirteen Defendant pharmaceutical manufacturers for their alleged role in causing Massachusetts to overpay pharmacies and other providers for generic prescription drugs under the Commonwealth's Medicaid Program by fraudulently inflating the "Wholesale Acquisition Cost" ("WAC") of covered drugs.[1] Massachusetts also alleges that Defendants reported false prices to the federal Secretary of Health and Human Services ("HHS") under the Best Prices rebate program, depriving Massachusetts of amounts it would have received from the Defendants. With respect to the allegations of inflated WACs, Massachusetts asserts causes of action for fraud (Count I), unjust enrichment (Count II), violations of the Massachusetts Medicaid False Claims Act, Mass. Gen. L. Ann. ch. 118E, §§ 40 and 41 (Count III), and violation of the Massachusetts False Claims Act, Mass. Gen. L. Ann. ch. 12, § 5A *et seq.* (Count IV). With respect to the claim involving Best Prices, Massachusetts asserts Defendants breached their federal Rebate Agreements with HHS (Count V), breached the implied covenant of good faith and fair dealing (Count VI), and violated the Rebate Statute, 42 U.S.C. § 1396r–8 (Count VII).[2] Defendants have moved to dismiss all counts of the Complaint.

---

1. Massachusetts names the following Defendants: Mylan Laboratories, Inc.; Barr Laboratories, Inc.; Duramed Pharmaceuticals, Inc.; Ivax Corporation; Warrick Pharmaceuticals Corporation; Watson Pharmaceuticals, Inc.; Schein Pharmaceutical, Inc.; Teva Pharmaceuticals USA, Inc.; Par Pharmaceutical, Inc.; Dey, Inc.; Ethex Corporation; Purepac Pharmaceutical Co.; and Roxane Laboratories, Inc.

2. The parties submitted to the Court a "model rebate agreement" issued by HHS, and do not discuss any differences relevant to this decision between the model and the actual agreements. The Court's discussion, therefore, is based on this model, termed the "Rebate Agreement."

After hearing and review of the briefs, the motion to dismiss Count VII is **ALLOWED** because the Court finds that there is no implied cause of action for the states under the Best Prices Statute. Otherwise, the motion to dismiss is **DENIED.**

## II. BACKGROUND

The following facts are drawn from the Complaint[3] and accepted as true for purposes of this motion to dismiss. Defendants dispute many of the facts.[4]

### A. *The Federal Medicaid Program*

The Medicaid program, established by Title XIX of the Social Security Act, is a uniquely cooperative federal-state program that provides medical assistance to certain low income individuals. *See* 42 U.S.C. §§ 1396—1396v.

Congress passed the Medicaid Best Prices Statute, 42 U.S.C. § 1396r–8, as part of the Omnibus Budget Reconciliation Act of 1990. Under that statute, a drug manufacturer must enter into a Rebate Agreement with the Secretary in order for federal matching funds to be made available for that manufacturer's covered out-

patient drugs. 42 U.S.C. § 1396r–8(a)(1). The Rebate Agreement provides that the Secretary enters the agreement "on behalf of the Department of Health and Human Services and all States and the District of Columbia (except to the extent they have in force an Individual State Agreement)." (Rebate Agreement at Preamble.) Upon entering a Rebate Agreement with the Secretary, the manufacturer must pay a quarterly rebate directly to each participating state based on all of the manufacturer's drugs purchased by that state pursuant to its Medicaid plan during that quarter.

For single source or innovator multiple source drugs, the rebate due on each unit paid for under the state plan is the difference between the average manufacturer price ("AMP")[5] and the manufacturer's best price, defined as the lowest price available from the manufacturer to any private purchaser or governmental entity (with certain exclusions) within the United States, or 15.1% of AMP, whichever is greater. 42 U.S.C. § 1396r–8(c)(1), (2). For multiple source non-innovator drugs, the rebate is 11% of AMP. 42 U.S.C.

3. The Complaint alleges patterns of pricing fraud involving average wholesale price substantially similar to those at issue in complaints filed in a separate multi-district litigation before this Court. *See, e.g., In re Pharm. Indus. Average Wholesale Price Litig.,* 263 F.Supp.2d 172 (D.Mass.2003) (Saris, J.) (*"Pharm.I "*); *In re Pharm. Indus. Average Wholesale Price Litig.,* 309 F.Supp.2d 165 (D.Mass.2004) (Saris, J.) (*"Pharm.II "*); *In re Pharm. Indus. Average Wholesale Price Litig.,* 307 F.Supp.2d 190 (D.Mass.2004) (Saris, J.) (*"Pharm.III "*); *In re Pharm. Indus. Average Wholesale Price Litig.,* 307 F.Supp.2d 196 (D.Mass.2004) (Saris, J.) (*"Pharm.IV "*); *In re Pharm. Indus. Average Wholesale Price Litig.,* 321 F.Supp.2d 187 (D.Mass. June 10, 2004) (Saris, J.) (*"Pharm.V "*); *In re Pharm. Indus. Average Wholesale Price Litig.,* 339 F.Supp.2d 165 (D.Mass.2004) (Saris, J.) (*"Pharm.VI "*). Summaries of the factual background are found in *Pharm. I,* 263 F.Supp.2d at 178–80

(describing alleged Average Wholesale Price ("AWP") scheme), and *Pharm. V,* 321 F.Supp.2d at 195–97 (describing alleged Best Prices scheme).

4. Many of the background facts about the statute and regulatory program are cloned from the Brief of Amicus Curiae United States, *In Re Pharm. Indus. Average Wholesale Price Litigation,* 263 F.Supp.2d 172 (D.Mass. 2003), related litigation.

5. "The term 'average manufacturer price' means, with respect to a covered outpatient drug of a manufacturer for a rebate period, the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts." 42 U.S.C. § 1396r–8(k)(1).

§ 1396r–8(c)(3). Each state must agree to cover all of the manufacturer's covered outpatient drugs unless the state complies with one of several statutory provisions allowing it to exclude or restrict coverage. 42 U.S.C. §§ 1396a(a)(54), 1396r–8(d). Any rebate amounts received by the state must be offset against the state's Medicaid expenditures that quarter for purposes of calculating the matching federal financial participation. 42 U.S.C. § 1396r–8(b)(1)(B).

States may enter directly into Rebate Agreements with drug manufacturers as authorized by the Secretary. 42 U.S.C. § 1396r–8(a)(1). To date, the Secretary has approved supplemental drug Rebate Agreements in at least twenty states. States may also control their Medicaid drug costs and coverage by establishing prior authorization programs, 42 U.S.C. § 1396r–8(d)(1)(A), or by creating drug formularies, 42 U.S.C. § 1396r–8(d)(1)(B)(iv). Though not part of the rebate statute, states are also permitted to set payment rates with respect to covered drugs. *See* 42 U.S.C. § 1396(a)(30); 42 C.F.R. 447.331–447.333.

Drug manufacturers are required under the rebate statute and agreement to calculate and report their AMPs and best prices to the Secretary on a quarterly basis. 42 U.S.C. § 1396r–8(b)(3)(A)(i); Rebate Agreement at § II(e). Any information provided by a manufacturer or wholesaler under the rebate statute is confidential and "shall not be disclosed by the Secretary ... or a State agency ... except as the Secretary determines to be necessary to carry out this section." 42 U.S.C. § 1396r–8(b)(3)(D); Rebate Agreement at § VII. States are required to report their total Medicaid drug utilization to each manufacturer and the Secretary sixty days

after the end of the rebate quarter.[6] 42 U.S.C. § 1396r–8(b)(2)(A). Using the manufacturer pricing data, the Centers for Medicare & Medicaid Services ("CMS") computes the unit rebate amount ("URA") "to which the Medicaid utilization information may be applied by States in invoicing the Manufacturer for the rebate payment due." Rebate Agreement at § I(dd).

The Secretary may survey wholesalers and manufacturers to verify reported AMPs and best prices, 42 U.S.C. § 1396r–8(b)(3)(B), and may audit manufacturer calculations of AMP and best price, Rebate Agreement at § III(c). The Secretary may impose civil money penalties on manufacturers that either fail to timely report their pricing information or submit false information to the Secretary. 42 U.S.C. § 1396r–8(b)(3)(C); Rebate Agreement at §§ III, IV. Section 1396r–8(b)(3)(C)(ii) also provides that any civil money penalties imposed under this subsection are "in addition to other penalties as may be prescribed by law." The Secretary may terminate the Rebate Agreement for either violations of the Rebate Agreement or for other good cause shown. 42 U.S.C. § 1396r–8(b)(4)(B)(i). The statute further provides:

> Such termination shall not be effective earlier than 60 days after the date of notice of such termination. The Secretary shall provide, upon request, a manufacturer with a hearing concerning such a termination, but such hearing shall not delay the effective date of the termination.

*Id.* If there is a termination, the Secretary must notify the states, § 1396r–8(b)(4)(B)(iv), and the Statute requires the Secretary to delay reinstatement of any terminated contract for one calendar quar-

---

**6.** The Rebate Agreement provides a dispute resolution mechanism in the event there is a disagreement between a state and a manufac-

turer regarding the state's Medicaid utilization information. Rebate Agreement at § V.

ter absent good cause. 42 U.S.C. § 1396r–8(b)(4)(C).

Rebate Agreements are effective only for one year, and "shall be automatically renewed for a period of not less than one year unless terminated under subparagraph (B)." 42 U.S.C. § 1396r–8(b)(4)(A).

While the Rebate Agreement does not address remedies for breach of contract, it specifies that it shall be construed under federal common law, and states that nothing in it shall be construed as a waiver of any legal right of the Secretary or the manufacturer under state or federal law. Specifically, it provides that: "The Rebate Agreement shall be construed in accordance with federal common law and ambiguities shall be interpreted in the manner which best effectuates the statutory scheme." *Id.* at IX(e).

### B. *The Massachusetts Medicaid Program*

The Massachusetts Medicaid program provides health benefits, including prescription drugs, to low-income residents. The Massachusetts Medicaid program spends approximately $1.2 billion annually on pharmaceutical products.

Massachusetts reimburses "providers," meaning doctors who directly administer drugs and pharmacies, based on formulae set out in Massachusetts regulations, which were developed in accordance with federal requirements. Reimbursement for non-innovator "multiple-source drugs," which are the generic drugs primarily involved here, is the lowest of (a) the Federal Upper Limit payment ("FUL") for the drug, if one is available, plus a dispensing fee; (b) the Massachusetts Upper Limit ("MUL") for the drug, if any, plus a dispensing fee; (c) the Estimated Acquisition

Cost ("EAC") of the drug, plus a dispensing fee; or (d) the pharmacy's usual and customary charge for the drug. Mass. Regs.Code tit. 114.3, § 31.04.[7]

Massachusetts regulations define the EAC as "an estimate of the price generally and currently paid by eligible pharmacy providers for the most frequently purchased package size of a drug." Mass. Regs.Code tit. 114.3, § 31.02. *See also* Mass. Regs.Code tit. 130, § 406.402. Prior to August 3, 2002, EAC was defined to be the drug's WAC plus 10%. Mass. Regs. Code tit. 114.3, § 31.02. Effective August 3, 2002, EAC is defined as WAC plus 5%. *Id.*

The FULs are established by CMS and are defined as "a reasonable dispensing fee established by the agency plus an amount established by the [CMS] that is equal to 150 percent of the published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists." 42 C.F.R. § 447.332(b).

Defendants supply pricing information in the form of WACs and AWPs to third party publishers, such as First Data Bank, which publish lists organized by drug. The published WACs do not reflect actual average prices paid by wholesalers or providers for drugs. Instead, the WACS reported by defendants are materially inflated, leading Massachusetts to pay excessive amounts to pharmacy providers. The difference between the reported prices and the actual average price is called the "spread" by Massachusetts. The complaint asserts: "The purpose of each defendant in creating the spread was to provide incentives or kickbacks for customers who buy and distribute its products, to

---

7. Reimbursement for single-source pharmaceutical products, which are typically brand-name drugs or drugs specifically requested by a doctor, is limited to the lower of (a) the EAC of the drug plus a dispensing fee, or (b) the pharmacy's usual and customary charge. (Compl. ¶ 28; Mass. Regs.Code tit. 114.3, § 31.04.)

increase the profits for such customers at the expense of the state Medicaid programs, and to increase its own profits by increasing its market share for particular drugs and classes of drugs." Throughout the period at issue, Defendants affirmatively endeavored to conceal the actual prices they charged to customers by using undisclosed discounts, rebates, and other inducements that had the effect of lowering the actual prices charged to pharmacies.

As an alternative theory, Massachusetts alleges that the AMPs reported by the manufacturers who participated in the Best Prices rebate program were materially understated, depriving Massachusetts of funds to which it was entitled. The AMPs are materially lower than the reported WACs and AWPs. Massachusetts points out that it cannot be true that both the WACs and the AMPs were accurate reports of true prices to wholesalers, although it is possible that one of the sets was accurate.

## III. DISCUSSION

### A. *Common Law Fraud (Count I)*

 Defendants have moved to dismiss the common law fraud count, claiming that (1) Defendants never asserted that WAC was a net price; (2) Massachusetts knew or should have known that WAC was not a net price; and (3) in certain cases the injury is not traceable to Defendants' conduct because Massachusetts reimbursed at rates above the applicable FULs.

"The elements of [intentional] misrepresentation are well established: in order to recover, plaintiff 'must allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his [or her] damage.' " *Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1471–72 (1st Cir.1996) (quoting *Barrett Assocs., Inc. v. Aronson*, 346 Mass. 150, 190 N.E.2d 867, 868 (1963)). "[I]n Massachusetts … a party who discloses partial information that may be misleading has a duty to reveal all the material facts he [or she] knows to avoid deceiving the other party." *Id.* at 1478 (quoting *Nei v. Burley*, 388 Mass. 307, 446 N.E.2d 674, 676 (1983)).

> Although there may be "no duty imposed upon one party to a transaction to speak for the information of the other … if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all material facts bearing upon the point that lie within his knowledge. Fragmentary information may be as misleading … as active misrepresentation, and half-truths may be as actionable as whole lies."

*Kannavos v. Annino*, 356. Mass. 42, 247 N.E.2d 708, 711–12 (1969) (quoting Fowler V. Harper et al., The Law of Torts, § 7.14 (date unavailable)).

> Regarding reliance,
>
> it is well established under Massachusetts law that 'failure to investigate the veracity of statements does not, as a matter of law, bar recovery for misrepresentation.' … 'Only reliance on "preposterous or palpably false" representations vitiates a misrepresentation claim.'

*Damon*, 87 F.3d at 1480 (citations omitted). However, "a person who is confronted with inconsistent or contradictory representations may not reasonably rely on one side of the controversy without attempting to resolve the inconsistency or contradiction." *Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F.Supp.2d 236, 242–43 (D.Mass.1999) (holding that as a matter of law plaintiff could not have reasonably relied on defendants' statements that smoking was not

harmful) (citing *Trifiro v. N.Y. Life Ins. Co.*, 845 F.2d 30, 33 (1st Cir.1988)).

The Complaint alleges that Defendants provide WACs through pricing publication services, and that "defendant manufacturers intend the WAC to be understood by the state Medicaid agencies as the average price paid by a wholesaler to a manufacturer for a given product." (¶ 30.) The Complaint alleges that the manufacturers knew that the states were relying on the WACs to determine the estimated acquisition cost of the drugs, knew that the states had no other sources of information, and affirmatively concealed the actual prices charged. (¶¶ 28, 32–33.)

Defendants strenuously argue that they never affirmatively represented WAC to be a net price, and that nothing in the pricing information published by First DataBank has ever stated that WAC is a net price. Massachusetts has submitted documentation (at the request of the Court) to support its allegation that WAC was represented by the publishers that allegedly act on behalf of manufacturers to reflect actual prices paid by wholesalers—that is, true wholesale prices net of discounts, and that WAC was commonly understood in the industry to reflect actual prices paid by wholesalers, at least until the 2001 and 2002 reports of the Office of the Inspector General. For example, in the 1994–1995 First DataBank Blue Book, the source for most states' pricing information, the term Wholesale Net Price or Wholesale Acquisition Cost (WAC) is defined as price to wholesaler or distributor. In the Spring 1994 copy of the publication "Health Care Financing Review," published by HHS, a table of definitions defines WAC as the "wholesaler's net payment made to purchase a drug product from the manufacturer, net of purchasing allowances and discounts." E. Kathleen Adams, Ph.D *et al.*, *State Medicaid Pharmacy Payments and Their Relation to Estimated Costs*, 15 Health Care Fin. R. 25, 26 (Spring 1994).

Massachusetts also submitted a portion of the 1996 version of Medi–Span's Master Drug Database Documentation Manual, which states:

> The WAC is the estimated cost to the wholesaler by the drug manufacturer . . . . Actual values can vary from these estimated values as wholesalers experience discounts through volume purchases or special deals causing variance from their standard costs.

When all reasonable inferences are drawn in favor of the non-moving party during the relevant period, the term WAC was understood in the trade to mean a true price, and Defendants were misrepresenting their true prices to the government.

■ Defendants next argue that Massachusetts knew or should have known that WAC was not a net price, and so Massachusetts could not have reasonably relied on it as a true price. Defendants point out that Massachusetts could have used the URA data from the Best Prices program to calculate the AMP of a drug, generally by dividing the URA by .11, thus learning that WACs exceeded reported AMPs. Defendants point to several national and state reports discussing whether WAC is an appropriate basis for reimbursement, and to a 2002 report from the Massachusetts Division of Health Care Finance and Policy ("DHCFP") discussing WAC inflation, as evidence that Massachusetts was on notice that WAC was not an accurate price. Defendants also note that Massachusetts still reimburses based on WAC. The Complaint alleges:

> At all times relevant to this action, neither DMA [the Massachusetts Division of Medical Assistance] nor knew the actual prices each of the defendants charged its customers for its products. Rather, DMA obtained pricing information from FDB [First Data Bank], and DMA and DHCFP reasonably relied on

this information in determining the Medicaid reimbursement levels for the products of each of the defendant manufacturers.

(¶ 34.) The ability to make a mathematical calculation based on URAs does not necessarily demonstrate as a matter of law that Massachusetts could not have reasonably relied on the reported WACs, for "under Massachusetts law ... 'failure to investigate the veracity of statements does not, as a matter of law, bar recovery for misrepresentation.'" *Damon*, 87 F.3d at 1480. The government reports, together with this opportunity to perform reverse-calculations, raise the issue of when Massachusetts became or should have become aware of the alleged WAC inflation, but finding out the true price of a drug is no easy matter because drug pricing terms are protean. The First Circuit pointed out that Massachusetts attempted to obtain accurate pricing data following the 2002 report, but pharmacies refused to provide any data, leaving Massachusetts to attempt to tinker with the WAC-based system. *Long Term Care Pharm. Alliance v. Ferguson*, 362 F.3d 50, 52, 59 (1st Cir. 2004). The reasonableness of any reliance is best left to a summary judgment record.

Finally, Defendants argue that for those instances in which Massachusetts reimbursed above the FUL, Massachusetts cannot prove that the WACs affected the reimbursement. Massachusetts argues that these instances are isolated administrative errors.[8] Massachusetts argues that if the error consisted solely of a failure to take into account FULs, but a true WAC would have been lower than whatever basis was used, then the correct FUL would limit damages but would not absolve Defendants of liability. This is a complicated factual issue the resolution of which will have to await the more detailed record available at summary judgment.

**B. Unjust Enrichment (Count II)**

Massachusetts brings the unjust enrichment claim to recover Defendants' "increased sales and market share" that were "a result of the Commonwealth's excessive payments to its Medicaid pharmacy providers." (Compl. at ¶ 60.) Defendants move to dismiss Massachusetts's unjust enrichment count, arguing that Massachusetts has an adequate remedy at law against providers, that there is no direct benefit to the Defendants, that there is no proof that the spread led to increased market share, and that it is impossible to have an increased market share in the multiple-source arena.

"A person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Nat'l Shawmut Bank of Boston v. Fidelity Mut. Life Ins. Co.*, 318 Mass. 142, 61 N.E.2d 18, 20 (1945) (quoting Restatement (First) of Restitution § 1 (1951)). "A person obtains restitution when he is restored to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its equivalent in money." Restatement § 1 comment (a). Unjust enrichment "does not require any contractual or fiduciary relationship between the parties." *Greenwald v. Chase Manhattan Mortgage Corp.*, 241 F.3d 76, 78 n. 1 (1st Cir.2001). Unjust enrichment does not require that a defendant receive direct payments from a plaintiff. *Id.* at 81. "Under the doctrine of unjust enrichment, a plaintiff seeks restitution of a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable." *See In re Lupron Mktg. & Sales Practices Litig.*, 295 F.Supp.2d 148, 182 (D.Mass.2003) (Stearns, J.) (citing other cases).

---

8. Massachusetts filed an amended exhibit list claiming to correct certain of these errors.

■ To satisfy the elements of unjust enrichment, a plaintiff must show: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) an absence of justification and (5) the absence of a remedy provided by law. *Id.* Liability in unjust enrichment involves a showing that wealth is "in one persons's hands when it should be in another's." *Id.* (citing *Guyana Tel. & Tel. Co. v. Melbourne Int'l,* 329 F.3d 1241, 1245 n. 3 (11th Cir.2003)).

■ Unjust enrichment is an equitable remedy, and "[i]t is a basic doctrine of equity jurisprudence that courts of equity should not act ... when the moving party has an adequate remedy at law." *Mort v. United States,* 86 F.3d 890, 892 (9th Cir. 1996) (quoting *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)). However, "[a] remedy at law cannot be considered adequate so as to prevent equitable relief, unless it covers the entire case made by the bill in equity." *Hillsborough Tp., Somerset County, N.J. v. Cromwell,* 326 U.S. 620, 629, 66 S.Ct. 445, 90 L.Ed. 358 (1946) (citation omitted). "[A] suit in equity will lie where the remedy at law is not clear or as adequate and complete as that which equity can afford." *G.E. Co. v. Callahan,* 294 F.2d 60, 64 (1st Cir.1961).

Courts have been flexible regarding when in the trial they require the plaintiff to choose its avenue of recovery. *See In re Lupron,* 295 F.Supp.2d at 182 n. 39 (dismissing unjust enrichment claim where plaintiffs had adequate RICO remedy, but noting that it was open to plaintiffs to elect to proceed under unjust enrichment theory); *Sentinel Prods. Corp. v. Mobile Chem. Co.,* 2001 WL 92272, at *22 n. 15 (D.Mass. Jan. 17, 2001) (allowing plaintiff to choose avenue of recovery at the trial stage).

Defendants argue that Massachusetts has an adequate remedy at law to recover overpayments. Plaintiff responds that any remedies at law against providers would leave Defendants in possession of the fruits of their alleged fraud in the form of profits from increased sales and market share. The Restatement of Restitution sets forth some circumstances in which a plaintiff has been permitted to recover the enrichment of another in excess of his impoverishment under the doctrine of unjust enrichment. *See* Restatement of Restitution, § 1 at comment e.[9] However, Plaintiff cites no caselaw directly supporting its broad claim to Defendants' profits and their market share.

Defendants argue that under the Commonwealth's reimbursement procedures, it is impossible for manufacturers of non-innovator multiple source drugs to increase sales or market shares by inflating their WACs because all competing, generally equivalent drugs are reimbursed at the same rate. Plaintiff disagrees, stating that the reimbursement rates for generically equivalent drugs vary based on the manufacturer's reported prices. The Court need not resolve these issues at this stage of the proceeding, since Massachusetts may have to elect only one theory of recovery eventually, and will not force Plaintiff to choose its remedy at this stage of the litigation.

### C. *Massachusetts Statutes*

■ Defendants also seek to dismiss the claims under the Massachusetts False

---

**9.** Comment e provides, in part:
 In other situations, a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust. In such cases, the defendant may be under a duty to give to the plaintiff the amount by which he has been enriched.

Claims Act, Mass. Gen. L. Ann. ch. 12, § 5B (West 2004) and the Massachusetts Medicaid False Claims Act, Mass. Gen. L. Ann. ch. 118E, §§ 40 and 41 (2004) (Counts III and IV). Because the grounds are essentially the same as those argued in support of dismissing the fraud claim, the Court denies the motion.

In their reply brief, Defendants argue that the anti-kickback provision, Mass. Gen. Laws Ann. ch. 118E, § 41, is preempted. According to Defendants, the lack of a scienter requirement means that certain behavior legal under the federal statute would be illegal under the Massachusetts statute, leading to inevitable conflict. In support, Defendants cite *State v. Harden*, 873 So.2d 352, 355 (Fla. 3d DCA 2004) (holding Florida anti-kickback statute, which punished negligent conduct, preempted by federal anti-kickback statute, which requires "knowing and willful" conduct, both because of difference in scienter and because of lack of safe harbor provisions in Florida statute).

Plaintiff points out that while the Massachusetts statute does not contain an explicit "knowing and willful" requirement, the First Circuit has held that the requirement that an amount be paid "to induce" another, found in the analogous federal statute, "imposes a second and stronger scienter requirement [than the knowing and willful requirement]." *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 33 (1st Cir.1989). The case is evolving on the scienter requirement. *Commonwealth v. Kobrin*, No. 9873CR438A–N, slip op. at 4 (Mass. Sup. Ct. June 29, 2001) (noting that "[l]anguage similar to that in G.L. c. 118E, § 41, in the federal Medicaid and Medicare Anti–Kickback statutes has been held to contain an intent element" and holding statute not unconstitutional for lack of a specific statement of scienter). *But see Boman v. S.E. Med. Services Group*, 1998 WL 1182063, at *10 (Mass.Super. Jan. 7, 1998) ("The primary difference between the federal anti-kickback statute and the state provisions is that the Massachusetts statutes do not require the action or practice to be knowing and willful.").

In light of the fact that this argument was raised late in the briefing, and the interpretation of the law is evolving, the Court will defer ruling.

**D. Implied Cause of Action under 42 U.S.C. § 1396r–8 (Count VII)**

■ Massachusetts claims a right to a private cause of action under 42 U.S.C. § 1396r–8, and argues that Defendants' reporting of false information was in violation of this statute. The Supreme Court set forth the standards for implying a cause of action in *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). It held:

> Like substantive federal law itself, private causes of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative.

*Id.* at 286–87, 121 S.Ct. 1511 (citations omitted). The Court addressed a similar argument in *Pharm. VI*, 339 F.Supp.2d at 177, rejecting the County of Suffolk's claims that it possessed a right of action because "[w]hile Suffolk arguably falls within a class of entities for whose benefit the Best Prices Statute was enacted, as a governmental entity obliged to pay for prescription drugs, Suffolk does not point to any provisions demonstrating a Congressional intent to create a remedy." *Id.*

Massachusetts differs from Suffolk in that it is clearly within the class of entities for whose benefit the Best Prices Statute

was enacted. However, it too fails to point to any provisions demonstrating a Congressional intent to create a private *remedy* for the state which would allow the state to obtain penalties for the provision of false information or to require the Secretary to terminate the Rebate Agreement. As the Supreme Court stated in *Sandoval*,

[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others. Sometimes the suggestion is so strong that it precludes a finding of Congressional intent to create a private right of action, even though other aspects of the statute (such as language making the would be plaintiff a member of the class for whose benefit the statute was enacted) suggest the contrary.

523 U.S. at 290, 118 S.Ct. 1244. Here, because the statute unambiguously gives the Secretary the power to terminate the Rebate Agreement, renew it and impose federal penalties for false or untimely filings, I conclude that the states do not have a remedy under the statute. This is not the end of the analysis, however, because the statute also requires the Secretary to enter into the Rebate Agreement on behalf of the state and is silent on the scope of the available contractual remedies. This will be discussed in the next section.

Accordingly, the Court dismisses Count VII.

### E. *Third–Party Beneficiary of the Rebate Agreements (Count V)*

■ Massachusetts brings a claim as a third-party beneficiary of the Best Prices Rebate Agreements, which are signed by the manufacturers and the Secretary of Health and Human Services. A court applying federal common law may look to the Restatement of Contracts for guidance regarding when a third-party beneficiary may sue. *Almond v. Capital Props., Inc.,*

212 F.3d 20, 24 (1st Cir.2000); *Davis v. United Air Lines, Inc.,* 575 F.Supp. 677, 679–680 (E.D.N.Y.1983). The Restatement (Second) of Contracts § 302 provides:

Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to perform in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the benefit of the promised performance. An incidental beneficiary is a beneficiary who is not an intended beneficiary.

"Only intended beneficiaries, not incidental beneficiaries, can enforce a contract." *Harvard Law Sch. Coalition for Civil Rights v. President & Fellows of Harvard College,* 413 Mass. 66, 595 N.E.2d 316, 319 (1992) (applying Massachusetts law). The crux in third-party beneficiary analysis is the intent of the parties. *In re Pharm. Indus. Average Wholesale Price Litig.,* 339 F.Supp.2d 165, 178 (D.Mass.2004) (quoting *McCarthy v. Azure,* 22 F.3d 351, 356 (1st Cir.1994)). The law requires "special clarity" to support a finding that the contracting parties intended to confer a benefit on a third party. *Id.* The intended party need not be specifically or individually identified in the contract, but must fall within a class clearly intended by the parties to benefit from the contract. *McCarthy,* 22 F.3d at 362.

■ The Court addressed a similar claim in *Pharm. VI,* 339 F.Supp.2d at 177–79, and found that Suffolk was not a third-party beneficiary because "[t]here is no 'clear indication' that counties (as opposed to states) were in the class of intended beneficiaries from the vantage point of ei-

ther the pharmaceutical manufacturers or the federal government or in the text of the [Rebate Agreements]." *Id.* at 179.

By contrast, the Rebate Agreement begins with the statement: "The Secretary, on behalf of the Department of Health and Human Services *and all States* and the District of Columbia." (emphasis added). It goes on to provide that participating manufacturers must pay rebates directly to the states based on the states' payments for the manufacturers' drugs. As noted in *Pharm. VI*, the primary benefit of the Rebate Agreements inures to the states, which also bear some responsibilities. 339 F.Supp.2d at 178. These indications show a clear intent on the part of the signatories to confer a special benefit on a discrete class that includes Massachusetts. *Id.*

Defendants' primary argument is that where the court has already found that there is no implied right of action under the statute establishing a government contract, a plaintiff may not seek third-party beneficiary status, as this would be an end-run around the holding that there was no Congressional intent to confer a private cause of action. The key case on point is *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir.2003). Relying on the canon of statutory construction that where a statute expressly provides a remedy courts should be loathe to provide additional remedies, the Second Circuit rejected a state law claim for breach of contract as a third-party beneficiary, finding it to be an indirect attempt at privately enforcing the prevailing federal wage statute. It held:

> To allow a third-party private contract action aimed at enforcing those wage schedules would be 'inconsistent with the underlying purpose of the legislative scheme and would interfere with the implementation of that scheme to the same extent as would a cause of action directly under the statute.'

*Id.* (citations omitted). "Although whether the plaintiff has a private right of action under the statute is conceptually distinct from whether the plaintiff may sue as a third-party beneficiary of the contract mandated by the statute, the same considerations largely determine both issues." *Davis v. United Air Lines, Inc.*, 575 F.Supp. 677, 680 (E.D.N.Y.1983) (Weinstein, J.) ("[A]llowing him to sue here under the contract would be allowing him to make an 'end-run' around a statute which the Court of Appeals has held did not allow him to sue."). In *Davis*, a key factor was that Congress had set up a "comprehensive administrative scheme" to remedy violations of the federal rights of the handicapped. *Id.* at 680. *Cf. Am. Hosp. Assoc. v. Schweiker*, 721 F.2d 170, 182–84 (7th Cir.1983) (holding that obligations of hospitals receiving federal money in exchange for caring for indigent persons stemmed not from contract principles applied to agreements to participate in program, but rather from interpretation of statutes and regulations, because government had right to alter expectations and obligations of private participants); *Rendleman v. Bowen*, 860 F.2d 1537, 1541–42 (9th Cir.1988) (in a federal scholarship program, holding that principles of statutory interpretation rather than contract law governed where parties' obligations stemmed from a statute, not a negotiated agreement, contract contained no terms that were not in the statute, and statute contained obligations beyond contract terms).

Weighing against the Defendants' argument are the well-established propositions that "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals," *Mobil Oil Exploration, Producing S.E., Inc. v. United States*, 530 U.S. 604, 607, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000), and that

**328**

when Congress uses language with a settled meaning at common law, Congress 'presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.'

*Beck v. Prupis,* 529 U.S. 494, 500–01, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000) (quoting *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952)). *See also Roedler v. Dep't of Energy,* 255 F.3d 1347, 1352–53 (Fed.Cir.2001) (examining contract and the statute it implemented for evidence of intent to create third-party beneficiary status); *Busby Sch. of N. Cheyenne Tribe v. United States,* 8 Cl.Ct. 596, 602 (1985) (upholding third-party beneficiary claim on motion to dismiss where contracts "incorporated therein the substance and intendment of these statutes").

These two lines of case law together establish the rule that a beneficiary to a federal contract has the right to enforce an agreement imposing duties on a person contracting with the government so long as this is consistent with the statutory scheme, and not an end-run on it. *See Miree v. DeKalb County,* 433 U.S. 25, 29, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977) (permitting a third-party beneficiary claim under state law with respect to a contract between a federal agency and a municipality); *cf. Boyle v. United Technologies Corp.,* 487 U.S. 500, 508–509, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) (observing that the private plaintiffs in *Miree* were "not seeking to impose upon the person contracting with the Government a duty contrary to the duty imposed by the Government contract ... [but][r]ather, it was the contractual duty *itself* that the private plaintiff (as third-party beneficiary) sought

to enforce.") (emphasis in original). *See also Falzarano v. United States,* 607 F.2d 506, 511 (1st Cir.1979) (declining to find third-party beneficiary status where the contract did not demonstrate an intent to benefit the plaintiffs except as incidental beneficiaries).

██ When this test is applied to the Rebate Agreements and the Statute, there are strong arguments on both sides of the ledger. On the one hand, the Best Prices Statute and the Rebate Agreement demonstrate a clearly expressed intent on behalf of the signatories to benefit the states by providing them with rebates. Medicaid is a unique "system of cooperative federalism," *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), where "the two governments are pursuing common purposes." *Pharm. Research & Mfrs. of Am. v. Walsh,* 538 U.S. 644, 666, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003).

On the other hand, as Defendants point out, the methods delineated in the Statute and the Rebate Agreement for handling disputes do not expressly provide a contract remedy to a state. The Secretary— but not the state—may terminate a contract for violation of the contract or other good cause after hearing, and may seek penalties. In situations where Defendants accuse states of providing incorrect information, the Rebate Agreement provides a remedy, requiring alternative dispute resolution and then a state hearing. Absent in the statute and contract is a parallel right for the state to seek contractual damages against a manufacturer when it provides false information to the state or federal government. Section V(f) of the Rebate Agreement seems to contemplate a state enforcement action against manufacturers through the Medicaid hearing mechanisms, providing: "The State hearing mechanism is not binding on the Secretary for purposes of his authority to implement the

civil money penalty provisions of the statute or this agreement." The Rebate Agreement also mentions the State's ability to request that CMS take action to correct inaccuracies in Best Prices and AMPs, stating that "[a] request for compliance action may also occur when the Manufacturer shows a pattern or history of inaccuracy in Medicaid Utilization Information." Rebate Agreement at VI(a).

While this is an issue of first impression and the contract is ambiguous regarding remedies available to states for breach of contract, the Rebate Agreement instructs the Court to construe it in a manner which "best effectuates" the statutory scheme. Permitting the states to sue as third-party intended beneficiary would advance congressional objectives of reducing Medicaid drug costs. As the Secretary of HHS stated in the context of the implied preemption analysis in the pharmaceutical multidistrict litigation, to the "extent that a state sues a drug manufacturer that failed to calculate its best price obligations in accordance with the Rebate Agreement or CMS guidance—but does not seek to impose any additional or contrary obligations—the state is merely enforcing the existing rebate program responsibilities and does not inject any more variation than if the Department of Justice brought suit." (Brief of the United States as Amicus Curiae at 17.) Here, the scheme, as reflected in the Statute and Rebate Agreement, involves close cooperation between the federal government and the state, each of which foots half the bill for Medicaid. This relationship differentiates those cases which decline to find third-party beneficiary status in private individuals because the federal government was deemed the sole enforcer of the laws or there were other remedies provided for the beneficiaries. Indeed, in its amicus brief, HHS stated

that it would invite the states to join as plaintiffs in any litigation involving breach of contract.[10] Accordingly, I deny the motion to dismiss Count V and Count VI.

### F. *Miscellaneous*

#### 1. *Filed Rate Doctrine*

■ Defendants claim that Massachusetts' Best Prices claims are barred by the Filed Rate doctrine, which "limits attacks outside the regulatory process on rates filed with federal regulatory agencies." *Pharm. I,* 263 F.Supp.2d at 192 (citing *Town of Norwood v. New England Power Co.,* 202 F.3d 408, 415 (1st Cir.2000)). The doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Ark. La. Gas Co. v. Hall,* 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). "The considerations underlying the doctrine ... are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to ensure that regulated companies charge only those rates of which the agency has been made cognizant." *Id.* at 578, 101 S.Ct. 2925 (citations omitted).

Defendants' Best Prices data submissions do not constitute "rates" or "tariffs," so this doctrine is inapplicable. The reported data do not control the rates which Defendants can charge customers, as a tariff would. The fact that rebates affect the net cost of the drugs to Massachusetts does not transform the data into tariffs. While Defendants have a duty to report accurate data for prices previously charged, this data does not control, or even affect, *prospective* prices, as a tariff would.

---

**10.** The Secretary of Health and Human Services is invited to file an amicus brief on the issue and urge reconsideration if he disagrees with this conclusion.

### 2. *Preemption*

Defendants' claims of conflict preemption are the same as those asserted against Montana and Nevada, and so the Court holds that Massachusetts' Best Prices claims are not preempted for the reasons given in *Pharm. V*, 321 F.Supp.2d at 197–201.

### 3. *Individual Motions*

Defendants assert individual motions to dismiss under Fed.R.Civ.P. 9(b) that will be addressed separately.

### ORDER

Defendants' motion to dismiss Count VII, asserting an implied right of action under the Best Prices Statute, is *AL-LOWED.* The Court *DENIES* the remainder of the motion.